1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION AT CLEVELAND

3
     UNITED STATES OF AMERICA,      CASE NO. 1:20-mj-4203
4
               Plaintiff,
5
          vs.                       Thursday, June 18, 2020
6
     TANDRE BUCHANAN, JR.,
7
               Defendant.
8

9

10          TRANSCRIPT OF PRELIMINARY/DETENTION HEARINGS
                   HELD VIA VIDEOCONFERENCE
11           BEFORE THE HONORABLE THOMAS M. PARKER
                 UNITED STATES MAGISTRATE JUDGE
12

13

14   APPEARANCES:

15   For the Plaintiff:       Scott C. Zarzycki,
                              Assistant United States Attorney
16

17
     For the Defendant:       Steven L. Bradley, Esq.
18

19

20   Official Court Reporter: Lance A. Boardman, RDR, CRR
                              United States District Court
21                            801 West Superior Avenue
                              Court Reporters 7-189
22                            Cleveland, Ohio 44113
                              216.357.7019
23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

1                          Table of Contents

2

3        Witnesses/Events                                    Page

4        WILLIAM L. HASTY                                      13

5              Mr. Zarzycki - Direct                           13
               Mr. Bradley - Cross                             42
6              Mr. Zarzycki - Redirect                         49

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 12:08:21 | 1 | (On the record at 12:08 p.m.) |
| 12:08:25 | 2 | THE COURTROOM DEPUTY:  The case before the |
| 12:08:26 | 3 | Court is 20-mj-4203, United States of America vs. Buchanan, |
| 12:08:31 | 4 | Jr. |
| 12:08:33 | 5 | THE COURT:  All right.  Let me begin by having |
| 12:08:37 | 6 | appearances of counsel noted for the record.  First with the |
| 12:08:39 | 7 | United States. |
| 12:08:39 | 8 | MR. ZARZYCKI:  Good afternoon, Your Honor. |
| 12:08:42 | 9 | Scott Zarzycki on behalf of the United States. |
| 12:08:47 | 10 | THE COURT:  Good afternoon, Mr. Zarzycki. |
| 12:08:54 | 11 | MR. BRADLEY:  Good afternoon, Your Honor. |
| 12:08:55 | 12 | Steven Bradley on behalf of the defendant, Mr. Tandre |
| 12:08:59 | 13 | Buchanan, Jr. |
| 12:09:01 | 14 | THE COURT:  And good afternoon, Mr. Bradley. |
| 12:09:08 | 15 | Good afternoon, Mr. Buchanan. |
| 12:09:10 | 16 | My name is Tom Parker.  I'm the magistrate judge |
| 12:09:12 | 17 | assigned to conduct a detention and preliminary hearing in |
| 12:09:16 | 18 | this case today. |
| 12:09:17 | 19 | I can see from the gallery view on my computer that we |
| 12:09:26 | 20 | have a number of people listening in.  I'm going to instruct |
| 12:09:29 | 21 | everybody who's listening in now to place their phones on |
| 12:09:32 | 22 | mute. |
| 12:09:39 | 23 | We are proceeding today by way of videoconference in |
| 12:09:42 | 24 | light of what's going on with the COVID-19 pandemic.  The |
| 12:09:48 | 25 | Congress has authorized the United States Courts to use |

12:09:53  1   video proceedings in order to best protect the health and

12:09:55  2   safety of all the participants who may otherwise -- would

12:10:00  3   otherwise have had to come and personally appear in court.

12:10:05  4        I'd like to inquire of the defense, Mr. Bradley,

12:10:07  5   whether the defense agrees to participate in today's hearing

12:10:11  6   by means of video.

12:10:13  7             MR. BRADLEY:  We do agree, Judge.  I had a

12:10:16  8   private conversation with my client prior to today's

12:10:20  9   hearing, and we discussed, amongst other things, this very

12:10:24  10  issue.  And we would consent to proceeding by

12:10:26  11  videoconference.

12:10:28  12             THE COURT:  And, Mr. Buchanan, can you please

12:10:30  13  confirm for the record what your lawyer has just stated,

12:10:34  14  that you also agree to proceed by way of videoconference?

12:10:39  15             THE DEFENDANT:  Yes, Your Honor, I agree.

12:10:42  16             THE COURT:  All right.  Thank you.

12:10:42  17       Let me just indicate some of the ground rules for the

12:10:46  18  videoconference.

12:10:47  19       What we've discovered now after several weeks of

12:10:50  20  proceeding this way is that it can be difficult for the

12:10:54  21  court reporter to make an accurate record at times because

12:10:59  22  of microphone sensitivity issues.  So anyone who's going to

12:11:03  23  speak on the record today needs to make sure they're

12:11:07  24  speaking directly at their device so that the microphone can

12:11:11  25  best pick up what they are saying.

12:11:14  1      Second, it's important that anyone who is speaking be

12:11:23  2  allowed to speak without any interruption from anyone else,

12:11:27  3  so if people who are now connected to this hearing make

12:11:31  4  sound on their end and if their phone is not muted, that

12:11:37  5  little bit of sound can interrupt the flow of the audio for

12:11:41  6  the speaker.

12:11:44  7      It's essential that the Government's lawyer, that

12:11:48  8  Mr. Buchanan as the person being charged, and that

12:11:52  9  Mr. Bradley as the defense attorney and, most importantly,

12:11:58  10  the court reporter be able to hear everything that's said,

12:12:01  11  so please do abide by the Court's indicated rules that you

12:12:05  12  should not speak, and, moreover, do your very best not to

12:12:10  13  even make any sounds while you are not speaking so that we

12:12:13  14  will not interrupt the audio feed.

12:12:15  15      Let me indicate to those who are actual participants

12:12:18  16  as opposed to those listening in that if you are an actual

12:12:24  17  participant, meaning Government's attorney, defense

12:12:28  18  attorney, defendant, Pretrial Services officer, and court

12:12:33  19  reporter, my courtroom deputy and me, if you're not able to

12:12:37  20  hear what's being said, please raise your hand so we can

12:12:41  21  stop and find out what is causing a problem with your audio

12:12:44  22  transmission.

12:12:45  23      If you get disconnected, we will see that you

12:12:52  24  disappeared from the gallery view, and we will stop so we

12:12:55  25  can make sure that we can reconnect with you if you get

12:12:58 1    disconnected. I obviously cannot make that same

12:13:01 2    representation to those who may be listening in.

12:13:04 3        And again, if you are listening in and you have not

12:13:06 4    yet done so, please find a button on your iPhone or your

12:13:13 5    smartphone by which you can mute the audio transmission from

12:13:17 6    your device and click that now.

12:13:18 7        All right. We are here in court today, virtually, for

12:13:27 8    a preliminary hearing and a detention hearing on the

12:13:31 9    Government's motion for detention. The purpose of the

12:13:33 10    preliminary hearing is to permit the Court to determine

12:13:36 11    whether there's probable cause to believe the offense

12:13:39 12    charged in the complaint has been committed and that the

12:13:44 13    defendant, the person being charged, is the one responsible

12:13:47 14    for committing that offense.

12:13:50 15        The preliminary hearing is not a finding of guilt.

12:13:53 16    It's not a determination that someone is not guilty. It's

12:13:59 17    simply a probable cause determination.

12:14:01 18        If the Court were to find probable cause, the case

12:14:05 19    would then be referred to the grand jury for further

12:14:08 20    proceedings, and the grand jury would then make its own

12:14:16 21    probable cause determination. If the grand jury found

12:14:18 22    probable cause, they would then return a document known as

12:14:21 23    an indictment, which would formally describe the charge

12:14:23 24    against the individual. It's no more or less than that.

12:14:27 25        Let me inquire, Mr. Bradley, is the defense still

12:14:32  1    desiring to proceed today with a preliminary hearing?

12:14:35  2              MR. BRADLEY:  Yes, Your Honor.

12:14:37  3              THE COURT:  All right.  Very well.

12:14:38  4         In addition to the preliminary hearing, the Court will

12:14:41  5    be conducting a detention hearing under the requirements of

12:14:44  6    the United States Bail Reform Act.  The Government has moved

12:14:47  7    for detention, and the Court must decide, utilizing the

12:14:52  8    factors set forth in the Bail Reform Act, whether

12:14:56  9    Mr. Buchanan should be granted release pending trial or

12:14:58  10   should be detained pending trial.

12:15:01  11        So at this stage, in order to make sure that we've got

12:15:05  12   all of the background issues appropriately addressed, let me

12:15:09  13   ask Mr. Zarzycki to summarize the charges and the associated

12:15:14  14   penalties.

12:15:16  15             MR. ZARZYCKI:  Yes, Your Honor.

12:15:17  16        Mr. Buchanan is charged in the complaint with a count

12:15:21  17   of interference with commerce by robbery, violation of Title

12:15:26  18   18 Section 1951.  That is punishable by a maximum term of

12:15:34  19   imprisonment of 20 years, a maximum fine of $250,000, a

12:15:37  20   period of supervised release of up to three years, and a

12:15:39  21   $100 special assessment.

12:15:43  22             THE COURT:  All right.  And I'm assuming from

12:15:44  23   the way you've described it, Mr. Zarzycki, that there is no

12:15:48  24   mandatory minimum sentence that is associated with that

12:15:50  25   charge.

12:15:51    1          MR. ZARZYCKI:  That is correct, Your Honor.

12:15:54    2          THE COURT:  All right.  Now, Mr. Buchanan, I

12:15:58    3   understand you previously received a copy of the complaint

12:16:00    4   and the affidavit.  Have you had an opportunity to review

12:16:04    5   those documents with Mr. Bradley, your attorney?

12:16:09    6          THE DEFENDANT:  Yes, sir, I have.

12:16:14    7          THE COURT:  And do you understand, sir, that

12:16:15    8   you have a Constitutional right to be represented by an

12:16:16    9   attorney at every stage of the proceedings in this matter?

12:16:21   10     Now, it's my understanding that Mr. Buchanan was

12:16:23   11   previously retained to serve as your legal counsel.  Can you

12:16:26   12   confirm for the record that you understand Attorney Bradley

12:16:30   13   is here on your behalf serving as your legal counsel?

12:16:33   14          THE DEFENDANT:  Yes, Your Honor, I confirm.

12:16:38   15          THE COURT:  All right.  Thank you.

12:16:38   16     Now, let me ask whether both the Government and

12:16:40   17   defense have had a full opportunity to prepare and have had

12:16:43   18   an opportunity to review the report of Pretrial Services as

12:16:47   19   prepared by Pretrial Services Officer Stolarik?

12:16:58   20          MR. ZARZYCKI:  The Government has had an

12:17:00   21   opportunity to review it, yes, Your Honor.  Thank you.

12:17:02   22          THE COURT:  Thank you.

12:17:03   23     Mr. Bradley?

12:17:03   24          MR. BRADLEY:  Judge, likewise, I've reviewed

12:17:05   25   the report prepared by Pretrial Services and am otherwise

12:17:10   1   prepared to proceed.

12:17:11   2         THE COURT:  All right.  Very good.

12:17:12   3      Now, just by way of background, let me indicate to

12:17:15   4   you, Mr. Buchanan, that at this hearing you have the right

12:17:17   5   to cross-examine any Government witnesses that may be

12:17:21   6   called.  You have the right to present your own evidence,

12:17:24   7   call your own witnesses if you wish.  You may testify under

12:17:29   8   oath if you wish, but you cannot be required to testify

12:17:33   9   because under the Constitution you have a right to remain

12:17:35   10   silent.

12:17:37   11      You may consult with your attorney at any time during

12:17:39   12   the course of today's hearing, so if you see something that

12:17:43   13   you don't understand or if you have a question for your

12:17:44   14   lawyer, please raise your hand.  I will see that and we will

12:17:50   15   stop, and we will be able to put you and Mr. Bradley into a

12:17:53   16   private break-out room so that he could answer any questions

12:17:55   17   you might have.

12:17:56   18      Do you understand that?

12:17:58   19         THE DEFENDANT:  Yes, Your Honor.

12:17:59   20         THE COURT:  All right.  Now, the evidence and

12:18:03   21   examinations to be conducted today will be limited to the

12:18:06   22   issue of probable cause for detention.  The Court will not

12:18:11   23   be considering any motions to suppress evidence today, nor

12:18:14   24   will the Court be considering any contention that evidence

12:18:16   25   has been unlawfully obtained.  If those issues exist, they

12:18:21  1    may be addressed at a later date and are preserved for that

12:18:25  2    purpose.

12:18:26  3        In the order of presentation, the Government will go

12:18:29  4    first, followed by the defense with any defense evidence,

12:18:33  5    and then we will hear arguments from counsel.

12:18:54  6        Now, from my examination of the charge in this case

12:19:00  7    and the requirements of the Bail Reform Act, this is not a

12:19:03  8    case in which there is a presumption under the law that

12:19:06  9    Mr. Buchanan should be detained.  Instead, there is a

12:19:12  10   presumption under the law that he should be granted bond.

12:19:15  11       Do both the Government and the offense agree with the

12:19:19  12   Court's assessment?

12:19:22  13            MR. ZARZYCKI:  Yes, Your Honor.

12:19:22  14            MR. BRADLEY:  Yes, Your Honor.

12:19:30  15            THE COURT:  All right.  Let me briefly

12:19:31  16   describe the issues that the Court will have to decide

12:19:33  17   before we get to the evidence.

12:19:34  18       On the issue of probable cause, as I mentioned, the

12:19:36  19   Court will simply decide whether there's probable cause to

12:19:38  20   believe that an offense has been committed and that the

12:19:43  21   defendant is the person responsible for that offense.

12:19:49  22       Somebody out there in telephone connection land is not

12:19:52  23   muted.  I'm going to ask everyone one more time to mute

12:19:58  24   their phones.  I keep getting feedback from some of these

12:20:01  25   telephones that we may have to force those phones to be

12:20:04   1   disconnected.  And I'm not referring to Hillary Kump, whose

12:20:11   2   name I see on my screen but whose phone is listed as muted.

12:20:15   3        On the issue of detention, the question that the Court

12:20:21   4   must examine is whether there are conditions of bond that

12:20:24   5   could be put in place that would reasonably assure the

12:20:26   6   safety of the community and that would reasonably assure the

12:20:28   7   appearance of the defendant at future proceedings.

12:20:31   8        So with those things having been said by way of

12:20:34   9   background, let me ask Mr. Zarzycki at this time, how do you

12:20:39  10   wish to proceed on behalf of the Government?

12:20:42  11             MR. ZARZYCKI:  Your Honor, the Government

12:20:45  12   would like to proceed, if it's okay with the Court, with

12:20:49  13   both the preliminary hearing and the detention hearing

12:20:54  14   simultaneously and offer evidence as to both at the same

12:20:56  15   time.

12:20:56  16             THE COURT:  That is actually my preference.  I

12:20:58  17   normally say that in advance.  But please, Counsel, we're

12:21:02  18   going to receive all the evidence on both probable cause and

12:21:06  19   detention at the same time.

12:21:09  20        And I should indicate for the record that both sides

12:21:12  21   have the right to proceed in whole or in part by way of a

12:21:14  22   proffer, a description of their evidence, rather than

12:21:18  23   actually calling witnesses.  That's permitted because under

12:21:21  24   the rules of court and the Rules of Evidence, the Rules of

12:21:27  25   Evidence preventing receipt of hearsay evidence do not apply

| | |
|---|---|
| 12:21:31 | 1 |

in a hearing like that.

So go ahead, Mr. Zarzycki, if you wish to proceed by calling witnesses or by proffering or both.

MR. ZARZYCKI:  The Government will proceed by both.

I would proffer previously provided Exhibits 1 through 16 as well as the testimony of Special Agent William Hasty.

With respect to the exhibits to proffer, Exhibits 1 through 8 are offered primarily for the preliminary hearing to show probable cause that the offense occurred.  They're offered as evidence of that for the preliminary hearing.

All exhibits 1 through 15 -- or 1 through 16, rather, are offered for purposes of the detention hearing.

THE COURT:  So the Government is offering Exhibits 1 through 16, Mr. Bradley.  Is there any objection to the Court's receipt of those exhibits?

MR. BRADLEY:  No, Your Honor.

THE COURT:  All right.  They will be received.

Mr. Zarzycki, are you proffering the report of Pretrial Services as well?

MR. ZARZYCKI:  Yes, Your Honor.

THE COURT:  Is there any objection to the Court's receipt of the report of Pretrial Services, Mr. Bradley?

MR. BRADLEY:  No.

**W. Hasty (Direct by Zarzycki)**          13

| | | |
|---|---|---|
| 12:22:50 | 1 | THE COURT:  All right.  That will be received |
| 12:22:51 | 2 | without objection as well. |
| 12:22:51 | 3 | What other proffers do you have, Mr. Zarzycki, prior |
| 12:22:55 | 4 | to calling your witnesses or witness? |
| 12:22:59 | 5 | MR. ZARZYCKI:  Your Honor, I would proffer the |
| 12:23:01 | 6 | affidavit in support of the complaint, or that's I believe |
| 12:23:06 | 7 | already part of the record. |
| 12:23:09 | 8 | THE COURT:  Very well. |
| 12:23:11 | 9 | MR. ZARZYCKI:  And that would be it. |
| 12:23:13 | 10 | THE COURT:  All right.  The Court has the |
| 12:23:15 | 11 | complaint and the affidavit attached as part of the record. |
| 12:23:19 | 12 | You may call your witness, Mr. Zarzycki. |
| 12:23:22 | 13 | MR. ZARZYCKI:  The Government calls Special |
| 12:23:25 | 14 | Agent William Hasty. |
| 12:23:29 | 15 | THE COURT:  All right, Mr. Hasty, you will now |
| 12:23:31 | 16 | be placed under oath.  If you'd please raise your right hand |
| 12:23:33 | 17 | to be sworn. |
| 12:23:35 | 18 | (Witness sworn.) |
| 12:23:45 | 19 | THE COURT:  Go ahead, Mr. Zarzycki. |
| 12:23:46 | 20 | MR. ZARZYCKI:  Thank you. |
| 12:23:46 | 21 | WILLIAM L. HASTY |
| | 22 | - - - - - |
| 12:23:47 | 23 | DIRECT EXAMINATION |
| 12:23:47 | 24 | BY MR. ZARZYCKI: |
| 12:23:48 | 25 | **Q**    Special Agent Hasty, could you state your name and |

**W. Hasty (Direct by Zarzycki)**                    14

| | | |
|---|---|---|
| 12:23:51 | 1 | spell it, please. |
| 12:23:52 | 2 | **A**    William Lee Hasty, H-A-S-T-Y. |
| 12:23:56 | 3 | **Q**    And where are you employed? |
| 12:23:58 | 4 | **A**    The Department of Justice, Federal Bureau of |
| 12:24:02 | 5 | Investigation. |
| 12:24:02 | 6 | **Q**    And how long have you been employed? |
| 12:24:03 | 7 | **A**    Nine years, nine months. |
| 12:24:07 | 8 | **Q**    And how long have you been in Cleveland and what unit |
| 12:24:12 | 9 | are you assigned to? |
| 12:24:13 | 10 | **A**    I've been in Cleveland since December 20, 2017.  I'm |
| 12:24:19 | 11 | assigned to squad 11, which is the Violent Crime Task Force. |
| 12:24:24 | 12 | **Q**    Okay.  And in the Violent Crime Task Force, what are |
| 12:24:29 | 13 | some offenses that you're investigating? |
| 12:24:32 | 14 | **A**    We investigate bank robberies, child pornography, |
| 12:24:38 | 15 | fugitives, weapons violations, Hobbs Act violations, and so |
| 12:24:42 | 16 | forth. |
| 12:24:42 | 17 | **Q**    Okay.  In your position as a special agent with the |
| 12:24:46 | 18 | FBI, did you have the opportunity to investigate incidents |
| 12:24:49 | 19 | that occurred on May 30, 2020, in downtown Cleveland? |
| 12:24:55 | 20 | **A**    Yes, I did. |
| 12:24:56 | 21 | **Q**    And as part of your investigation, did you look into |
| 12:25:02 | 22 | damage done or things that were stolen from the Colossal |
| 12:25:10 | 23 | Cupcakes located in downtown Cleveland? |
| 12:25:12 | 24 | **A**    Yes, I did. |
| 12:25:12 | 25 | **Q**    Where specifically is that located? |

**W. Hasty (Direct by Zarzycki)**                    15

12:25:14    1    **A**      It's located on Euclid Avenue, west of Public

12:25:18    2    Square -- east of Public Square, rather.

12:25:22    3    **Q**      Okay.  And is that located in the Northern District of

12:25:24    4    Ohio?

12:25:24    5    **A**      Yes, sir, it is.

12:25:30    6    **Q**      And in your investigation can you explain to the Court

12:25:32    7    what specifically it was that you were looking into, that

12:25:36    8    you were investigating?

12:25:38    9    **A**      Certainly.

12:25:39   10         There were a series of break-ins at several businesses

12:25:49   11    along Euclid Avenue, and we were working with local partners

12:25:58   12    to identify and prosecute those responsible for the violent

12:26:07   13    acts.

12:26:07   14         Now, the Federal Government's responsibility primarily

12:26:11   15    extends to those establishments with people inside, so my

12:26:15   16    focus was on the locations that had victims inside while

12:26:22   17    they were broken into and looted.

12:26:27   18    **Q**      And did you investigate or interview some witnesses or

12:26:31   19    victims in that business, Colossal Cupcakes?

12:26:36   20    **A**      Yes, sir, I did.

12:26:37   21    **Q**      And who did you interview?

12:26:40   22    **A**      I interviewed the owner, Kelly Kandah.  I interviewed

12:26:44   23    her four employees.  There was Michelle, Caleb.  So I

12:26:55   24    want -- there was Jack, and then the final was a young girl

12:27:03   25    named Anastacia.  Yes.  So I interviewed five total victims

**W. Hasty (Direct by Zarzycki)**                    16

12:27:08    1    at the Colossal Cupcakes establishment.

12:27:11    2    **Q**    Okay.  And were there in fact five people present

12:27:15    3    during an incident that occurred on May 30?

12:27:17    4    **A**    Yes.

12:27:18    5    **Q**    And after your interview with those individuals, what

12:27:23    6    did you learn about what had happened?

12:27:24    7    **A**    I learned that the four employees had been working

12:27:31    8    their shift there when Kelly, the owner, who resides nearby,

12:27:41    9    she was informed that she might want to come back to the

12:27:43    10   store because things are getting, you know, potentially

12:27:48    11   dangerous.

12:27:49    12         Kelly arrived back to the store.  They unlocked the

12:27:53    13   door, let her in.  And she immediately began kind of telling

12:27:58    14   the employees, hey, things are going to get bad, they're

12:28:02    15   going to break the windows and so on, but it's going to be

12:28:05    16   okay.

12:28:07    17        And right at that point she describes what she heard

12:28:12    18   as the sound of a gunshot or something similar, and she

12:28:16    19   looked to her right and saw one of the two plate glass

12:28:23    20   windows there with a small hole in it, and then she saw the

12:28:26    21   hole expand as the window shattered.

12:28:30    22        And at that point she moved back to where her cash

12:28:35    23   register is, about halfway back in the establishment, and

12:28:39    24   somebody, at least one person she says had come through the

12:28:48    25   windowpane and had jumped up on the counter in a really

**W. Hasty (Direct by Zarzycki)**                    17

12:28:53  1   aggressive manner right in front of her.

12:28:55  2       And at about that time she felt and heard a cinder

12:29:00  3   block go right by her head.  And at that point she felt as

12:29:04  4   if she was in mortal danger, and that's when she really felt

12:29:09  5   that things had changed and it was a very dangerous

12:29:15  6   situation.

12:29:15  7       So she retreated back in through the kitchen into the

12:29:19  8   lone bathroom at the back of the establishment and locked

12:29:25  9   herself in with the other four employees while at least two

12:29:28  10  of them had made calls to 911.

12:29:38  11  **Q**    Okay.  And so they were able to lock themselves in the

12:29:40  12  bathroom.  How long did -- and was anyone able to report how

12:29:44  13  long that they had had to stay in the bathroom before help

12:29:47  14  arrived?

12:29:47  15  **A**    It was reported to be about 10 minutes.

12:29:51  16  **Q**    Okay.  And how were they let out of the bathroom?  Or

12:29:57  17  how did they -- what made it appear safe enough for them to

12:30:03  18  come out of the bathroom?

12:30:04  19  **A**    There was a Cleveland Police tactical element that --

12:30:08  20  because the 911 reported that they were locked in the

12:30:11  21  bathroom, so the Cleveland Police arrived on scene while

12:30:15  22  the, you know, looting and such was still going on.  They

12:30:19  23  were able to essentially form a pocket of safety out of

12:30:22  24  which they could escape.

12:30:24  25      So they arrived at the establishment, went to the

**W. Hasty (Direct by Zarzycki)** 18

12:30:27  1   back, announced their office and intent, what they want.

12:30:33  2   And the five victims inside initially didn't believe it was

12:30:36  3   the police and wanted them -- had armed themselves with a

12:30:42  4   spray bottle of bleach or some kind of bathroom cleaner.

12:30:47  5   And once they determined it was the police, then they were

12:30:51  6   given a moment to gather a few things, and then they escaped

12:30:58  7   on Euclid Avenue.

12:31:00  8   **Q**     Did anyone notice -- any of the five employees or the

12:31:07  9   owner, did anyone notice any items missing upon them walking

12:31:10  10  out of the bathroom?

12:31:11  11  **A**     One of the victims identified the five point of sale

12:31:17  12  machines -- they're tablets.  I think two were iPads and the

12:31:23  13  others were Android devices of some kind.  And they use

12:31:27  14  those for point of sale, for Grubhub and all those types of

12:31:31  15  businesses where people can order online.

12:31:35  16        And it was of interest because this victim uses the

12:31:38  17  same charging area for his cell phone, and he noticed that

12:31:45  18  in that area the five tablets were gone, but his cell phone

12:31:48  19  had been kind of hidden under something and that was still

12:31:50  20  there.  So he got his cell phone and left.  But he noted

12:31:56  21  that the five point of sale machines had been taken at that

12:31:59  22  point.

12:31:59  23  **Q**     Okay.  And the rest of the business, were they able to

12:32:06  24  describe the state of the business or what had been done to

12:32:08  25  it?

**W. Hasty (Direct by Zarzycki)**                    19

12:32:09   1   **A**      They said a lot of glass had been broken.  The front

12:32:13   2   two panels at least, the front two panes had been broken out

12:32:17   3   of the plate glass window.  The display case I believe may

12:32:21   4   have been damaged.  And, you know, other than that, there

12:32:23   5   was nothing regarding specifics at that time of the damage,

12:32:28   6   but it was described as having been ransacked, by many of

12:32:33   7   the victims.

12:32:38   8   **Q**      Were they able to see or hear what was going on at the

12:32:42   9   store while they were in the bathroom?

12:32:43  10   **A**      Right.  So they -- because of where they were, there

12:32:46  11   were no windows in the bathroom.  They couldn't see

12:32:49  12   anything.  But most of the victims described it as just a

12:32:52  13   torrent of sound of a crowd outside, things crashing.  So it

12:32:58  14   was described as a very near sound, so it could have been

12:33:01  15   just on the other side of the door.

12:33:04  16   **Q**      Okay.  All right.  And after you obtained this

12:33:07  17   information, did you -- were you able, through assistance of

12:33:15  18   photographers and people who were present during what was

12:33:18  19   happening downtown, able to obtain additional photographic

12:33:26  20   evidence and things of that nature?

12:33:27  21   **A**      Yes.  We reached out to the public and reached out to

12:33:30  22   those who may have been down there for their assistance, and

12:33:33  23   some members of the public provided photos and videos taken

12:33:39  24   from the scene.  We used that as well as, you know, a

12:33:47  25   database of cameras downtown, the Hanna Building and so

12:33:53  1    forth, to try to capture a timeline of what happened at what

12:33:57  2    location.

12:33:59  3    **Q**    Okay.

12:33:59  4    **A**    And that information coupled with approximately a

12:34:02  5    dozen call-ins to either the Crime Stoppers line or to our

12:34:11  6    office led to the preliminary identification of Tandre

12:34:15  7    Buchanan, Jr., as our suspect, one of the three suspects at

12:34:19  8    least.

12:34:19  9    **Q**    Okay.  And before we get to that, did anyone in the --

12:34:22  10   either the owner or one of the four victim employees

12:34:27  11   describe an individual coming to the store as wearing any

12:34:33  12   bright orange colors?

12:34:34  13   **A**    Yes.  I believe at least two of the victims described

12:34:40  14   seeing a guy in orange.  I know one of them was certain that

12:34:44  15   person had been inside the store with -- it was just like --

12:34:50  16   he described it as kind of orange everything, he said.  You

12:34:55  17   know, orange head covering of some kind and an orange

12:34:59  18   sweatshirt.  And so that would have put the person in orange

12:35:05  19   inside the business.

12:35:07  20   **Q**    Okay.  And you had said that you had obtained some

12:35:14  21   video outside the store.  Did that show -- or, I'm sorry,

12:35:21  22   video or photographs.  Did those show a person in orange in

12:35:26  23   any of those?

12:35:26  24   **A**    Yes.  In several of the photos and one of the videos

12:35:32  25   at least showed -- the video had showed a person in orange

**W. Hasty (Direct by Zarzycki)** 21

12:35:36  1   exiting through the -- first the further west windowpane

12:35:42  2   that had been broken out.

12:35:44  3   **Q**     Okay.  Did the owner of Colossal Cupcakes also take

12:35:52  4   some short video of her own?

12:35:53  5   **A**     Yes, she did.  That -- it must have been a live

12:35:57  6   broadcast or something that was also captured.  We viewed

12:36:01  7   that.  And in a still image from the video there can be seen

12:36:09  8   a person in orange at what appears to be inside the store.

12:36:15  9   **Q**     And what did the entire video depict, to your

12:36:20  10  recollection?

12:36:20  11  **A**     It was very chaotic with the movement of the camera

12:36:25  12  and the sounds of everything going on, obviously the fear in

12:36:29  13  the voice of the victim.  But it -- I believe it shows their

12:36:36  14  moving back, retreating back from the storefront back

12:36:40  15  towards the diner door where the kitchen is, if memory

12:36:43  16  serves.

12:36:48  17  **Q**     Now, have you had an opportunity to review Exhibits 1

12:36:52  18  through 16 prior to your testimony here today?

12:36:54  19  **A**     Yes, I have.

12:36:55  20  **Q**     In Exhibit 1, what does that photograph depict, or

12:37:00  21  still photograph?

12:37:01  22  **A**     Photograph 1 appears to show a gentleman with an

12:37:09  23  orange sweatshirt, an orange do-rag, and black pants of some

12:37:14  24  kind in the vicinity of the window that's broken out.  With

12:37:20  25  the depth and everything, you can't make a certain

**W. Hasty (Direct by Zarzycki)** 22

12:37:24 1   determination if that person's inside or outside, but it

12:37:28 2   looks to be inside.

12:37:31 3   **Q**   And in the video, does the actual video, the moving

12:37:36 4   video, does it appear to show an individual moving inside

12:37:39 5   the store?

12:37:40 6   **A**   Yes. The video is much more certain, and you can see

12:37:46 7   the person exiting through the broken windowpane area.

12:37:52 8   **Q**   Okay. Now, the -- go ahead. I'm sorry.

12:37:59 9   **A**   I was saying, it was exiting from the inside of the

12:38:01 10   store to the outside where the sidewalk is.

12:38:03 11   **Q**   Okay. And was there other photographic or video

12:38:11 12   evidence that did show someone in orange coming out of the

12:38:13 13   store as well?

12:38:13 14   **A**   Yes. I saw another video that I believe showed the

12:38:19 15   same thing.

12:38:21 16   **Q**   Okay. Now, showing you first -- we'll go to Exhibit

12:38:31 17   Number 2. What does that photo show?

12:38:38 18   **A**   Exhibit 2 shows a gentleman standing in the windowpane

12:38:46 19   area that has been broken out. The gentleman's wearing an

12:38:49 20   orange do-rag and what appears to be orange sweatshirt. A

12:38:55 21   lot of that person is obscured by other members of the

12:38:59 22   public walking along the sidewalk.

12:39:08 23   **Q**   And in this exhibit can you describe exactly where it

12:39:10 24   is that you're talking about?

12:39:11 25   **A**   Certainly.

**W. Hasty (Direct by Zarzycki)** 23

12:39:15 1    THE COURT: Let me interject. In the

12:39:18 2 interests of making sure we use the Court's time as

12:39:22 3 efficiently as possible, I've always considered that

12:39:25 4 photographic evidence is fairly self-explanatory. There's

12:39:28 5 an old saying that indicates that a picture is worth a

12:39:32 6 thousand words. What I'm trying to do is make sure that we

12:39:35 7 don't get one thousand words for each of the pictures that

12:39:39 8 you seek to address the Court's attention to. You certainly

12:39:41 9 are entitled to make a description, but I can see reasonably

12:39:46 10 well what the photographs attempt to show. So if you could

12:39:49 11 just have a more laser-like focus on exactly why you think

12:39:56 12 each photograph is important, that would be greatly

12:39:58 13 appreciated.

12:39:58 14    MR. ZARZYCKI: Absolutely, Your Honor.

12:40:01 15 **Q**    Agent Hasty, what's the significance of Exhibit Number

12:40:04 16 2?

12:40:04 17 **A**    Exhibit 2 shows the person within the broken

12:40:09 18 windowpane area, certainly not on the exterior of the

12:40:14 19 business.

12:40:16 20 **Q**    Okay. Now, what is the time of day that this is all

12:40:19 21 happening?

12:40:19 22 **A**    It's approximately 6:30, give or take a few minutes.

12:40:24 23 **Q**    Were you able to obtain metadata from the victims'

12:40:30 24 cell phone video footage that you saw, or at least the still

12:40:34 25 frame from Exhibit Number 1, what time of day that was

**W. Hasty (Direct by Zarzycki)**                    24

| | | |
|---|---|---|
| 12:40:37 | 1 | taken? |
| 12:40:38 | 2 | **A**    Yeah, I believe that was taken at 6:38 p.m. |
| 12:40:41 | 3 | **Q**    Okay.  And this video or Exhibit Number 2, that's |
| 12:40:44 | 4 | taken from a different video; is that right? |
| 12:40:46 | 5 | **A**    Correct.  This is a still image from a video also |
| 12:40:50 | 6 | taken at 6:38 p.m. |
| 12:40:56 | 7 | **Q**    Okay.  So these are approximately the same time that |
| 12:40:59 | 8 | this is occurring? |
| 12:41:00 | 9 | **A**    Yes, sir. |
| 12:41:02 | 10 | **Q**    Okay.  Now, Exhibit Number 3, can you take a look at |
| 12:41:06 | 11 | that and explain the significance of that photo? |
| 12:41:07 | 12 | **A**    Certainly.  The significance of this photo is I'm |
| 12:41:10 | 13 | looking up and down the sidewalk here, and I see some broken |
| 12:41:16 | 14 | glass from the window, and I see the person in orange, you |
| 12:41:22 | 15 | know, continuing to exit the windowpane area. |
| 12:41:27 | 16 | **Q**    Okay.  Now, Exhibit 4, what is the significance of |
| 12:41:33 | 17 | that photograph? |
| 12:41:33 | 18 | **A**    Exhibit 4 shows a person wearing an orange sweatshirt, |
| 12:41:40 | 19 | orange do-rag, black athletic style pants, and orange Nike |
| 12:41:48 | 20 | sneakers with a turquoise stool that matches the turquoise |
| 12:41:51 | 21 | stool from inside the business breaking out the window, the |
| 12:41:55 | 22 | other window that person had previously exited next to, if |
| 12:42:01 | 23 | that makes sense. |
| 12:42:01 | 24 | **Q**    Did you talk to the owner of the business and identify |
| 12:42:03 | 25 | if that was a stool that is used inside of her store? |

12:42:08  1   **A**     Yes, that is a stool that matches those used in her

12:42:12  2   store.

12:42:13  3   **Q**     Okay.  And when you were watching the video, prior to

12:42:17  4   the man in orange climbing out of the window, were you able

12:42:21  5   to at least see a somewhat unobstructed view or somewhat

12:42:26  6   obstructed by individuals walking up and down of the

12:42:28  7   sidewalk prior to him exiting the store?

12:42:31  8   **A**     Correct.

12:42:33  9   **Q**     And did you see at that time, before the guy -- the

12:42:42  10  person in orange got out of that window, did you see a blue

12:42:46  11  stool on the sidewalk at any time during that video?

12:42:48  12  **A**     In none of the photos or videos that I saw was I able

12:42:51  13  to see a stool like this along the sidewalk, along the

12:42:59  14  exterior of the business.

12:43:08  15  **Q**     All right.  Now, Exhibit Number 5, can you explain the

12:43:13  16  significance of that exhibit?

12:43:15  17  **A**     Certainly.

12:43:17  18      Exhibit 5, this shows the gentleman in orange

12:43:25  19  continuing to hit the window with the stool.  It also shows

12:43:28  20  who we believe to be one of the codefendants, the gentleman

12:43:33  21  in the black and white sneakers, black pants, and

12:43:38  22  multicolored sweatshirt, the turquoise shoulder area and

12:43:44  23  hood.

12:43:49  24  **Q**     Okay.  Now, Exhibit Number 6, what is the significance

12:43:51  25  of this photograph?

**W. Hasty (Direct by Zarzycki)**                    26

12:43:52  1   **A**    This photograph shows the gentleman, the codefendant,

12:43:56  2   inside the store.  We can see the shoulder and hood area of

12:44:01  3   that sweatshirt inside the store while the gentleman in

12:44:06  4   orange has the stool in an aggressive manner still.

12:44:10  5   **Q**    Okay.  Are these photographs taken in chronological

12:44:13  6   order or are these still pictures from the video taken in

12:44:17  7   chronological order?

12:44:18  8   **A**    That is correct.

12:44:18  9   **Q**    Now, Exhibit 7, what's the significance of that

12:44:26  10  photograph?

12:44:27  11  **A**    Exhibit 7 shows the gentleman in the multicolored

12:44:32  12  sweatshirt again very far inside the business, almost where

12:44:38  13  the cash register is.  And it also shows the gentleman clad

12:44:44  14  all in black approaching one of the display cases.

12:44:47  15  **Q**    In watching the video, did the person in the

12:44:50  16  multicolored sweatshirt in the blue and black, did he go

12:44:54  17  behind the counter at any time?

12:44:56  18  **A**    Yes.

12:44:59  19  **Q**    And did both of these individuals go into this

12:45:02  20  business after the person in orange exited that window?

12:45:06  21  **A**    Correct.

12:45:07  22  **Q**    Okay.  Now, Exhibit 8, can you explain the

12:45:15  23  significance of this photograph?

12:45:16  24  **A**    Sure.  Exhibit 8 shows the gentleman in orange

12:45:20  25  continuing to attack the window.  It shows a woman in the

12:45:27  1    foreground holding a bag of popcorn.  And it also shows a

12:45:33  2    gentleman all in black with red shoes as he's leaping

12:45:36  3    through the air out of the broken windowpane area holding

12:45:42  4    what appears to be a pop bottle that matches those sold by

12:45:46  5    the store.

12:45:46  6    **Q**    Okay.  And while that person is exiting with that

12:45:49  7    bottle from the store, is the person in orange still engaged

12:45:54  8    in smashing the window at that time?

12:45:56  9    **A**    That is correct.

12:45:58  10   **Q**    Okay.  Now, this video where these stills are taken,

12:46:03  11   do they show the activities that's going on on Euclid Avenue

12:46:06  12   both before and during this incident?

12:46:10  13   **A**    That's correct.

12:46:14  14   **Q**    Okay.  Does this video still -- does it show going

12:46:19  15   down one direction east as well as a direction west?  Does

12:46:24  16   it capture the entire I guess scene, what's happening on the

12:46:28  17   street?

12:46:28  18   **A**    Right.  It doesn't move from just one position to the

12:46:33  19   other.  It's trending towards the east, but they at times

12:46:36  20   move back to the west to see something at the arcade or

12:46:39  21   something if there's activity there.

12:46:41  22   **Q**    Okay.  And what's going on on that street at that time

12:46:45  23   from what you're able to see from the video?

12:46:46  24   **A**    Near constant breaking up of glass and looting of

12:46:49  25   businesses.

12:46:52  1   **Q**    Okay.  And by looting of businesses, you mean people

12:46:54  2   going through glass openings and stealing things from the

12:46:57  3   establishments along Euclid Avenue?

12:47:03  4   **A**    Yes.

12:47:04  5   **Q**    Is that all going on around the same time that this

12:47:06  6   incident is occurring with the Colossal Cupcakes?

12:47:27  7   **A**    Yes, it is.

12:47:27  8   **Q**    Okay.  And were you able to take stills from this

12:47:35  9   video in order to put those out to the public to get someone

12:47:40  10  to identify the person in orange?

12:47:42  11  **A**    That is correct.

12:47:43  12  **Q**    Okay.  And when you -- you said at some point in your

12:47:50  13  testimony you received a tip or someone identified a

12:47:54  14  Mr. Tandre Buchanan.  Is that correct?

12:47:58  15  **A**    Yes, sir.

12:47:58  16  **Q**    Okay.  And once you had that tip, were you able to

12:48:00  17  obtain photographs or social media pictures that assisted

12:48:07  18  you in confirming that it was Mr. Buchanan in the orange on

12:48:11  19  that day?

12:48:11  20  **A**    Correct.  We looked at both the person's Instagram

12:48:18  21  profile, and one of the photos in the Instagram profile had

12:48:22  22  the gentleman wearing an orange sweatshirt that appeared to

12:48:25  23  match that one seen in previous photos, as well as his

12:48:28  24  driver's license printout which the historical photos

12:48:33  25  clearly matched those of photos admitted as exhibits.

**W. Hasty (Direct by Zarzycki)**                     29

12:48:40  1   **Q**     Okay.  So there was an Instagram photo where he was

12:48:44  2   wearing that same sweatshirt?

12:48:45  3   **A**     Yes, sir.

12:48:45  4   **Q**     Okay.  And once you saw the Instagram photos and you

12:48:53  5   saw the driver's license photo, what was your next move from

12:48:56  6   there?

12:48:56  7   **A**     The next move was to determine the best way to

12:49:04  8   continue to gather evidence and gather information on the

12:49:08  9   person's whereabouts.  We defined the person -- the location

12:49:14  10  where he worked as well as his residence and did an

12:49:19  11  affidavit for a search warrant and arrest warrant for

12:49:23  12  Mr. Buchanan.

12:49:25  13  **Q**     Okay.  And while you're doing this investigation, did

12:49:27  14  this image of Tandre Buchanan in that same orange

12:49:33  15  sweatshirt, did it stay posted on Instagram?

12:49:37  16  **A**     No.  Concurrent with us looking at it, the profile was

12:49:42  17  turned private.  But we had already scraped the entire

12:49:47  18  profile.

12:49:47  19  **Q**     Okay.  While you were looking at it, it became

12:49:52  20  private?

12:49:52  21  **A**     Correct.

12:49:53  22  **Q**     How soon after this incident occurred were you looking

12:49:56  23  at it?

12:49:56  24  **A**     15 minutes.

12:49:59  25  **Q**     And had the news put out who the person was to the

**W. Hasty (Direct by Zarzycki)** 30

12:50:07  1    public, the person in orange?

12:50:11  2    **A**    Right, exactly.  15 minutes after the press release

12:50:15  3    was conducted, we received our first call.

12:50:19  4    **Q**    Okay.  And once the press released that and you got

12:50:24  5    your first call, how soon after was his Instagram changed to

12:50:29  6    private?

12:50:30  7    **A**    I'd have to check the timeline, but I believe it was

12:50:33  8    within the hour, probably 15, 20 minutes.

12:50:37  9    **Q**    Okay.  Now, did you make an arrest and interview

12:50:42  10   Mr. Buchanan?

12:50:43  11   **A**    Correct, we did.

12:50:44  12   **Q**    And what was the result of that interview?

12:50:47  13   **A**    We -- I was not personally involved in the arrest, but

12:50:56  14   my colleagues delivered Mr. Buchanan to our office.  And

12:51:01  15   myself and my colleague, TFO Lynn Bilko, sat Mr. Buchanan

12:51:07  16   down, and we interviewed him for about two and a half hours.

12:51:16  17       We completed an FD-395 Advice of Rights form.

12:51:23  18   Mr. Buchanan indicated he wished to continue the

12:51:28  19   conversation without an attorney present.  And we went over

12:51:30  20   the activities of the 30th, when he arrived down there, how

12:51:37  21   things are gotten violent between the police and the

12:51:41  22   protesters and how it turned into a violent situation,

12:51:43  23   moving towards Public Square and down Euclid Avenue.

12:51:49  24   **Q**    Did Mr. Buchanan admit during his interview that it

12:51:56  25   was him wearing the orange sweatshirt and smashing the

12:51:59   1    window?

12:51:59   2    **A**     He did.

12:52:00   3    **Q**     Did at any time he admit to going into the business?

12:52:03   4    **A**     He did not admit at the time, but when confronted with

12:52:07   5    the fact that we had video of him exiting, he didn't

12:52:10   6    challenge it.

12:52:12   7    **Q**     Okay.  Now, the -- did you have another photograph to

12:52:17   8    show Mr. Buchanan, a photograph of him holding the head of a

12:52:21   9    deer in his hand?

12:52:23  10    **A**     Correct.  We had an image taken I believe right at 7

12:52:29  11    p.m. showing Mr. Buchanan holding a deer trophy, you know,

12:52:37  12    above his shoulders.

12:52:40  13    **Q**     And what time of day was that?  What was the location

12:52:43  14    and what did Mr. Buchanan say about that?

12:52:45  15    **A**     He said he saw it right there, picked it up, held it

12:52:52  16    for a few photos, and then put it right back down again.

12:52:55  17         The photo was taken right in the Cleveland State

12:52:58  18    University campus area, I believe along Euclid Avenue, right

12:53:03  19    at 7 p.m.

12:53:05  20    **Q**     Right at 7 p.m.?  Okay.

12:53:06  21         And how far away -- where was it taken from?

12:53:10  22    **A**     That -- the photo was taken from a car across the

12:53:16  23    street from where Mr. Buchanan was, and that's several

12:53:21  24    blocks from the vicinity of Playhouse Square and the Euclid

12:53:31  25    corridor that was previously discussed.

**W. Hasty (Direct by Zarzycki)**                    32

| | | |
|---|---|---|
| 12:53:33 | 1 | **Q**    Where was the actual trophy taken from? |
| 12:53:35 | 2 | **A**    Oh, the -- I later received a phone call -- initially |
| 12:53:39 | 3 | we didn't know, but last Friday I received a phone call from |
| 12:53:43 | 4 | Gordon Geiger, owner of Geiger's Sporting Goods store, and |
| 12:53:48 | 5 | he stated that that deer trophy had been in their store for |
| 12:53:54 | 6 | 82 years. |
| 12:53:57 | 7 | We received some video from them, and one of the five |
| 12:54:00 | 8 | or six cameras they have in their store has the deer antlers |
| 12:54:06 | 9 | on each side of the camera, so you can see it clearly what |
| 12:54:09 | 10 | it is.  And then a gentleman breaks a window and they come |
| 12:54:14 | 11 | in, and someone reaches up and grabs the deer head and pulls |
| 12:54:18 | 12 | it away.  And from there it's taken outside and I believe |
| 12:54:27 | 13 | taken at that point by Mr. Buchanan. |
| 12:54:31 | 14 | **Q**    Okay.  Now, when you said Mr. Buchanan was confronted |
| 12:54:37 | 15 | by this, he said he found it on the ground, picked it up, |
| 12:54:41 | 16 | took a picture with it, and put it back down in the area |
| 12:54:44 | 17 | around Columbus State? |
| 12:54:46 | 18 | **A**    Yes. |
| 12:54:47 | 19 | **Q**    And then where did he go from there? |
| 12:54:48 | 20 | **A**    He says he went home.  It wasn't his girlfriend -- he |
| 12:54:54 | 21 | was with a girl, but the girl wasn't his girlfriend, so they |
| 12:54:57 | 22 | took either his car or her car back to where he lived on |
| 12:55:02 | 23 | 165th. |
| 12:55:06 | 24 | **Q**    And was he asked whether he had gone back downtown at |
| 12:55:12 | 25 | any time or anywhere near the City Tap that's located |

12:55:17  1    downtown?

12:55:17  2    **A**    So the following morning we were discussing some

12:55:22  3    curiosities because we had some surveillance footage from

12:55:25  4    City Tap showing a guy in a do-rag and orange sweatshirt on

12:55:30  5    camera at I think it was 9:30 or so, thereabouts, give or

12:55:36  6    take a few minutes.  And that person was outside of a

12:55:40  7    vehicle removing a car seat and a stool or something.  And

12:55:47  8    the plate was visible on the surveillance footage, and the

12:55:55  9    plate on the vehicle was returned -- we ran the

12:55:57  10   registration, and the vehicle registration returned to

12:55:59  11   Kenneth Dunnican, who is Tandre Buchanan's brother.

12:56:04  12   **Q**    And do they live at the same location?

12:56:05  13   **A**    I don't believe so.

12:56:11  14   **Q**    Okay.  All right.  And was he asked about that?

12:56:16  15   **A**    He was.  He asked, you know, why that would be, why

12:56:21  16   would we would -- why we would see this person in orange

12:56:25  17   there or why his brother's car would be there, and he had no

12:56:31  18   answer for that.

12:56:32  19   **Q**    Okay.  Now, you said that you -- did you also obtain a

12:56:38  20   search warrant in addition to the arrest warrant for

12:56:41  21   Mr. Buchanan?

12:56:42  22   **A**    Correct.

12:56:42  23   **Q**    Was the search conducted?

12:56:44  24   **A**    The search was conducted, yes, on -- it was

12:56:46  25   essentially concurrent with the arrest on the evening of the

12:56:49   1    11th.

12:56:50   2    **Q**    Okay.  And did you locate the deer head trophy?

12:56:55   3    **A**    We did not.

12:56:56   4    **Q**    Did you locate the orange sweatshirt or the orange

12:56:58   5    do-rag?

12:56:58   6    **A**    No.  No, during the interview Mr. Buchanan told us

12:57:01   7    that he had gotten rid of the orange sweatshirt that night

12:57:05   8    because it had received some (audio interference) and a hole

12:57:11   9    in it from where he was shot with the rubber bullets from

12:57:15   10   police, and he saw fit to get rid of it that way.

12:57:19   11       The following morning he mentioned that he had gotten

12:57:24   12   rid of all of it after his father had told him to do so.

12:57:33   13   **Q**    All right.  Now, when you -- in addition to some of

12:57:37   14   the still photos we've already seen and identified, did you

12:57:40   15   get other videos from throughout the city of Cleveland and

12:57:42   16   combine that with the defendant's statements sort of tracing

12:57:47   17   the path throughout the area of downtown Cleveland both

12:57:50   18   before Colossal Cupcakes and after?

12:57:53   19   **A**    Yes, we did.

12:57:55   20   **Q**    And what was the path?

12:57:56   21   **A**    We had a shot along -- in the vicinity of Playhouse

12:58:06   22   Square that shows Mr. Buchanan carrying the deer trophy

12:58:10   23   across the street, and he's accompanied by the same girl

12:58:16   24   that he's seen in the other photos with.  And it is curious

12:58:25   25   because it contradicts what was stated previously where he

12:58:27  1   picked it up right there and took a photo with it and then

12:58:30  2   discarded it.

12:58:32  3        You know, Mr. Buchanan was cooperative during the

12:58:37  4   interview and signed a -- and he signed a consent to search

12:58:45  5   the cell phone.  He had an iPhone 8 that we did an extract

12:58:50  6   on.  I returned it to his father.  But during the search of

12:58:54  7   that phone, I came across a video showing Mr. Buchanan

12:58:59  8   throwing a brick through the window or door — it's a glass

12:59:05  9   door — of the Huntington Bank Building at Playhouse

12:59:09  10  Square -- I mean Public Square.

12:59:10  11  **Q**    That came from his cell phone?

12:59:12  12  **A**    That came from his cell phone.  I can't say with

12:59:16  13  certainty that his cell phone captured it.  It may have been

12:59:19  14  taken by his cell phone or sent to his phone from someone

12:59:22  15  else.  I can't say at this time.

12:59:23  16  **Q**    Okay.  So looking at Exhibit Number 9, can you tell us

12:59:28  17  what that is?

12:59:28  18  **A**    Certainly.

12:59:31  19       Exhibit Number 9 is just a still from that video that

12:59:36  20  shows the revolving door glass pane being broken out.

12:59:46  21  **Q**    And Exhibit Number 10?

12:59:48  22  **A**    Exhibit Number 10 is a still taken from the same video

12:59:54  23  a second or two later that show him walking away from the

12:59:58  24  door.

12:59:58  25  **Q**    "Him" being Mr. Buchanan?

**W. Hasty (Direct by Zarzycki)** 36

01:00:02 1    **A**    Yes, sir.

01:00:02 2    **Q**    Okay.  And now, just chronologically, before what

01:00:09 3    happened at Colossal Cupcakes?

01:00:11 4    **A**    It is before.

01:00:12 5    **Q**    Okay.  Where did Mr. Buchanan start and where did he

01:00:17 6    go?

01:00:17 7    **A**    So he says he arrived at the Justice Center around

01:00:24 8    2:30 or 3.  He attended a funeral earlier in the day for a

01:00:29 9    family member, and he arrived at the Justice Center at 2:30

01:00:33 10   or 3 for the protest that he said initially was really

01:00:36 11   great, everything was going really well.  And then he

01:00:40 12   asserted that the police launched rubber bullets and tear

01:00:46 13   gas at the protesters, and that turned the otherwise

01:00:50 14   peaceful protesters into, you know, more violent agitators.

01:00:53 15       And at that point they moved from the Justice Center

01:00:59 16   to Public Square and then eastward towards Playhouse Square.

01:01:07 17   **Q**    Okay.  So now is the bank that you see in the exhibit,

01:01:10 18   the revolving door.  Exhibits 9 and 10, are those on the way

01:01:13 19   to Public Square?

01:01:16 20   **A**    Yes, sir.  It's just east of the Soldiers' and

01:01:20 21   Sailors' Monument, right at the intersection where it meets

01:01:24 22   Euclid Avenue.

01:01:26 23   **Q**    And did Mr. Buchanan say that -- any other store that

01:01:32 24   he had gone into on his way towards Public Square or away

01:01:40 25   from Public Square?

**W. Hasty (Direct by Zarzycki)** 37

01:01:41 1 **A** Just one. He had mentioned that he had gone inside

01:01:43 2 Heinen's. Heinen's had been broken into as well, and he

01:01:48 3 stated he went in I believe to look around.

01:01:52 4 **Q** Okay. This is Exhibit Number 10. What does that

01:01:56 5 show?

01:01:56 6 **A** Exhibit Number 10 is taken a second or two after the

01:02:01 7 last one that shows him walking away from the door that had

01:02:06 8 previously been broken out.

01:02:08 9 **Q** I'm sorry. Exhibit Number 11.

01:02:10 10 **A** Exhibit 11. Exhibit 11 shows Mr. Buchanan, who had --

01:02:16 11 in other photos we've seen him in the middle of Euclid

01:02:19 12 having removed the orange sweatshirt. He had an Army

01:02:21 13 T-shirt on underneath. This shows him with the black

01:02:25 14 T-shirt on just inside the broken window area of the

01:02:29 15 Heinen's store.

01:02:30 16 **Q** Okay. And again, he did confirm that he was also in

01:02:34 17 that store as well?

01:02:34 18 **A** Yes, he said he went inside, I think he said to look

01:02:38 19 around.

01:02:39 20 **Q** Was Heinen's looted, too, or was anything stolen from

01:02:43 21 Heinen's?

01:02:44 22 **A** Yes, yes.

01:02:45 23 **Q** Now, Exhibit Number 12, what is that -- the

01:02:55 24 significance of that?

01:02:56 25 **A** Exhibit 12 --

W. Hasty (Direct by Zarzycki)                    38

01:02:57  1          THE COURT:  We've already covered Exhibit 12.

01:03:00  2   Q     All right.  Can you describe for the Court when

01:03:12  3   talking with Mr. Buchanan about Colossal Cupcakes and did he

01:03:20  4   explain any motive or what his purpose was for doing what he

01:03:25  5   did there?

01:03:25  6   A     He felt as if the owner had paid for the defense fund

01:03:35  7   for the officer who had shot, he pronounced it "Tay-mar"

01:03:40  8   Rice.  I knew it as "Ta-meer" Rice.  I don't know which is

01:03:44  9   correct.  But he asserted that the owner had somehow paid

01:03:47  10  for the court fees and everything for that police officer,

01:03:53  11  so -- and that he had been inside the store previously and

01:03:56  12  knew the owner.

01:03:57  13  Q     Okay.  And was that something that he described as a

01:04:05  14  motive, or what was the purpose for him telling you this?

01:04:08  15  A     I can't say, you know, why he would say that, but, you

01:04:16  16  know, he was -- when describing it, you know, he was, you

01:04:20  17  know, very emotional and agitated and felt strongly about

01:04:27  18  it.

01:04:27  19  Q     Okay.  Now, you had mentioned later there was a

01:04:37  20  photograph or some video evidence from the City Tap.  That's

01:04:43  21  also a business downtown?

01:04:48  22  A     Correct.  It's about a block away.  It's a bar that

01:04:52  23  serves the area.

01:04:55  24  Q     Okay.  And can you explain Exhibit 13?

01:04:57  25  A     Exhibit 13 as an image from the surveillance from City

**W. Hasty (Direct by Zarzycki)**                    39

01:05:05  1   Tap, and it shows a blue Hyundai sedan and a gentleman with

01:05:16  2   an orange do-rag and orange sweatshirt and black pants

01:05:19  3   removing what appears to be a child seat and something else

01:05:22  4   from the trunk of the vehicle.

01:05:25  5   **Q**    Is there a plate on the vehicle?

01:05:29  6   **A**    The vehicle's registration returns to Kenneth

01:05:33  7   Dunnican, who is Mr. Buchanan's brother.

01:05:35  8   **Q**    Is this directly outside of City Tap?

01:05:38  9   **A**    Yes.

01:05:38  10  **Q**    And was City Tap also looted or were things taken from

01:05:46  11  that business?

01:05:46  12  **A**    Yes.  They were looted, but no one was present inside.

01:05:51  13  I spoke with the owner, and he said he had a lot of things

01:05:55  14  taken, including several bottles of Crown Royal, including

01:06:02  15  broken glass on the sidewalk.

01:06:05  16  **Q**    All right.  And in the search of the defendant's

01:06:10  17  phone, did you find any text messages that assisted in your

01:06:14  18  investigation or confirming where Mr. Buchanan may have been

01:06:16  19  that evening?

01:06:17  20  **A**    Yes.

01:06:19  21  **Q**    Okay.  Showing you Exhibit Number 16, just skipping a

01:06:26  22  couple of exhibits here, what is the significance of that?

01:06:29  23  **A**    The blue -- the blue balloon is a text message

01:06:37  24  received from someone else, the contact lists B-herbo.  The

01:06:47  25  green is the account name of the phone searched,

01:06:50  1   Mr. Buchanan's.  The account name is Tea with --

        2                   [Reporter interjection.]

01:07:07  3                   The blue is B-herbo.  The green searched

01:07:14  4   phone, the name on that one is Tea w/ Tee:  Herbs N' Tee.

01:07:33  5   Q     And that number matched to Tea w/ Tee, is that

01:07:40  6   associated with the number of the cell phone that you were

01:07:42  7   searching that belonged to Mr. Buchanan?

01:07:43  8   A     Yes.

01:07:43  9   Q     And does that text that says, "My brother wya," does

01:07:51  10  that mean "where you at"?

01:07:54  11  A     Yes.

01:07:54  12  Q     And is the time on that 9:50 p.m.?

01:07:57  13  A     Yes.

01:07:57  14  Q     What was the time of the photograph taken, the still

01:08:01  15  photograph taken at City Tap where the license plate that

01:08:06  16  belongs to the defendant, to Mr. Buchanan's brother?

01:08:09  17  A     I believe it was just after 9:30.

01:08:13  18  Q     All right.  Showing you Exhibit Number 14.

01:08:24  19  A     Yes.

01:08:24  20  Q     What is the significance of this?

01:08:26  21  A     This is a message sent from that phone to a group of

01:08:35  22  individuals, and the text sent, to quote, "I fucked downtown

01:08:44  23  up," end quote.

01:08:46  24  Q     Okay.  Is that later in the evening on May 30?

01:08:49  25  A     Yes.  That's 11:02 p.m.

**W. Hasty (Direct by Zarzycki)**                    41

01:08:51  1   **Q**     And Exhibit Number 15, is that another text message

01:08:59  2   that you found from Mr. Buchanan's cell phone?

01:09:01  3   **A**     Yes, that's from the following day at approximately

01:09:23  4   2:56 p.m.  And he sends the text message stating --

01:09:28  5                  [Reporter interjection.]

01:09:28  6   **Q**     And it says that they both -- "They only had two Crown

01:09:35  7   bottles.  I sold them both."

01:09:37  8        Did you speak with City Tap and were there bottles of

01:09:40  9   Crown Royal stolen?

01:09:40  10  **A**     Correct.  I spoke with the owner, and he confirmed

01:09:43  11  with me that he had several bottles of Crown Royal stolen.

01:09:46  12  **Q**     Okay.

01:10:05  13                  MR. ZARZYCKI:  May I have a moment, Your

01:10:06  14  Honor?

01:10:06  15                  THE COURT:  You may.

01:10:15  16                  MR. ZARZYCKI:  Thank you.

01:10:16  17  **Q**     And getting near to the end here.

01:10:19  18       Agent Hasty, were you able to also through the phone

01:10:24  19  obtain any information, GPS information that showed some of

01:10:29  20  the whereabouts of the defendant that day?

01:10:31  21  **A**     There was a GPS data point.  There weren't a large

01:10:37  22  number of data points, but one of the GPS points showed the

01:10:41  23  phone approximately a block away from the City Tap just

01:10:46  24  after 9:30 p.m.

01:11:29  25  **Q**     Agent Hasty, lastly, at that business, on Colossal

W. Hasty (Cross by Bradley)                    42

01:11:34   1    Cupcakes, did you look into whether that was engaged in

01:11:38   2    interstate commerce?

01:11:39   3    **A**    Yes.  The owner does sell the cupcakes to people

01:11:50   4    outside the state of Ohio.

01:11:54   5               MR. ZARZYCKI:  All right.  Thank you, Agent

01:11:55   6    Hasty.  Nothing further.

01:11:57   7               THE COURT:  Mr. Bradley, do you wish to

01:11:59   8    inquire?

01:12:00   9               MR. BRADLEY:  I do, Your Honor.  May I

01:12:04   10   proceed?

01:12:04   11              THE COURT:  Yes, sir.

01:12:05   12                    CROSS-EXAMINATION

           13   BY MR. BRADLEY:

01:12:08   14   **Q**    Good afternoon, Special Agent.

01:12:09   15   **A**    Good afternoon, Mr. Bradley.

01:12:10   16   **Q**    You indicated that you spoke to a total of five people

01:12:17   17   from Colossal Cupcakes, the owner plus four employees.  Is

01:12:21   18   that right?

01:12:21   19   **A**    Yes, sir.

01:12:22   20   **Q**    And when did you conduct those interviews in relation

01:12:28   21   to these events you're describing?

01:12:31   22   **A**    I believe I was assigned the case, it was almost a

01:12:38   23   week later from the incident.  I spoke to the owner the day

01:12:44   24   I was assigned to it, I believe, and then Mr. Caleb Cass, I

01:12:54   25   think we spoke to him, if memory serves, it was the 10th,

01:12:57  1   and then the remaining three, we spoke to them during the

01:13:00  2   day of the 11th.

01:13:02  3   **Q**     Fair enough.  So my point though, at least a week or

01:13:07  4   so after the events at issue?

01:13:08  5   **A**     Yes, sir.

01:13:09  6   **Q**     And when you did interview them, did you interview

01:13:11  7   them all individually or were some of the employees together

01:13:16  8   simultaneously?

01:13:17  9   **A**     The owner was interviewed by herself, and then Caleb

01:13:22  10  was by himself.  Jack was by himself.  Anastacia was at

01:13:29  11  another branch that's opening in another city.  Her friend

01:13:35  12  was present but not participating in the interview.  I think

01:13:38  13  she excused herself when we arrived.  And then Michelle was

01:13:43  14  by herself.

01:13:46  15  **Q**     And I think you stated earlier that when you spoke

01:13:50  16  with the owner of Colossal Cupcakes, she indicated that she

01:13:57  17  returned back to the store after she received a call from

01:14:00  18  one of her employees.  Right?

01:14:02  19  **A**     Yes, sir.

01:14:03  20  **Q**     And I think you indicated that she was present in the

01:14:08  21  store when the first of two large plate -- glass plate

01:14:15  22  windows was broken.

01:14:17  23        Is that right?

01:14:18  24  **A**     That's correct.

01:14:18  25  **Q**     Was she able to identify anybody that would have been

**W. Hasty (Cross by Bradley)**                    44

01:14:25   1   responsible for breaking that window?

01:14:27   2   **A**     No, sir.

01:14:28   3   **Q**     And I think you also described that based on that

01:14:35   4   interview, that you learned that the employees all retreated

01:14:39   5   into a bathroom.  Right?

01:14:41   6   **A**     Yes.

01:14:42   7   **Q**     And that the police responded to a 911 call and that

01:14:48   8   the best estimate from the owner was they were in the

01:14:55   9   bathroom for approximately 10 minutes.

01:14:56   10  **A**     I don't know if the owner gave that number.  I don't

01:15:01   11  think we asked her.  That 10-minute figure came from

01:15:04   12  Michelle who was the -- I think she's being trained to be a

01:15:09   13  manager or something there.  She said 10 minutes.

01:15:11   14  **Q**     All right.  And from any of the employee or owner

01:15:16   15  interviews, were you able to determine how long the store

01:15:20   16  owner had been in there and witnessed the first window

01:15:23   17  broken until they went into the bathroom?

01:15:25   18  **A**     It was just based on the conversation.  It was not a

01:15:33   19  long period.  I think Kelly said that she didn't expect it

01:15:37   20  to be as violent as it was, so I think she was talking to

01:15:42   21  one of the people that had come in and said, "Hey, there's

01:15:45   22  people inside, excuse me, everything's fine, calm down."

01:15:50   23  And that's about the time that she said she kind of felt the

01:15:53   24  air and heard the sound of the cinder block go by her head.

01:15:57   25  And that's when she said things had changed and that's when

01:16:01  1   she knew that she was in danger and so then she saw the

01:16:05  2   window.  It wasn't a long time.  It was -- you know, I can't

01:16:08  3   speculate, but, I mean, under a minute certainly.

01:16:10  4   **Q**    Okay.  And you indicated that she described either

01:16:16  5   seeing or hearing or feeling a cinder block go by her head.

01:16:21  6   Was she able to identify an individual that was responsible

01:16:24  7   for throwing that cinder block?

01:16:25  8   **A**    No, sir.

01:16:26  9   **Q**    And did she -- she or really any of the employees or

01:16:36  10  store owner, were they -- did they personally witness the

01:16:43  11  gentleman in the orange that we've identified as

01:16:47  12  Mr. Buchanan, did they witness him breaking the window of

01:16:51  13  the second glass plate window?

01:16:54  14  **A**    If memory serves, I believe one of the witnesses did

01:17:01  15  recall that, the same person that had seen him inside the

01:17:06  16  store, because Caleb was -- he was essentially thinking he

01:17:18  17  wanted to kind of protect them.  So I'd have to check my

01:17:23  18  interview with him to confirm if he saw him at the window

01:17:27  19  with the stool or not, but I'm certain he saw him inside the

01:17:30  20  store.

01:17:38  21  **Q**    And I think it was Caleb is the individual that

01:17:41  22  described noticing that five points of sale terminals were

01:17:47  23  missing.

01:17:47  24  **A**    Yes, sir.

01:17:48  25  **Q**    And did either Caleb or any of the other

**W. Hasty (Cross by Bradley)**                    46

01:17:52   1   employees/owner witness anybody taking those point of sale

01:17:59   2   terminals?

01:18:00   3   **A**     No.  At that point they were locked inside the

01:18:02   4   bathroom.

01:18:04   5   **Q**     And I think you described that -- or you testified

01:18:07   6   that the witnesses described to you that it was quite

01:18:12   7   chaotic and that there were -- it sounded as if a number of

01:18:18   8   people were inside the Colossal Cupcakes premises.

01:18:25   9   **A**     Yes.

01:18:25   10  **Q**     And did you get any sense as to a number, how many

01:18:29   11  individuals?  Was there an estimate provided to you?

01:18:32   12  **A**     It was just a crowd on the other side of the door with

01:18:36   13  things crashing, so no one speculated as to the number.

01:18:44   14  Just it was noisy and scary, they said.

01:18:49   15  **Q**     And were anybody -- do you know from your interviews

01:18:54   16  whether other people had entered the premises before

01:18:58   17  Mr. Buchanan?

01:18:59   18  **A**     That -- no, I don't believe so.  After, yes, but not

01:19:06   19  before.

01:19:06   20  **Q**     And you're basing that upon interviews with the

01:19:13   21  employees and the owner?

01:19:15   22  **A**     Yeah, it's a combination of the interviews of the

01:19:20   23  victims as well as photos and videos that we had collected.

01:19:26   24  **Q**     Did you -- during your two-plus-hour interview with

01:19:31   25  Mr. Buchanan, did you question him about the point of sale

**W. Hasty (Cross by Bradley)**                    47

01:19:36    1    terminals?

01:19:37    2    **A**    I don't think -- I don't think we asked him

01:19:42    3    specifically if he had taken those.  I don't believe that

01:19:46    4    was discussed.

01:19:46    5    **Q**    Did you ask him whether he had taken any property from

01:19:52    6    Colossal Cupcakes?

01:19:54    7    **A**    The stool was discussed, and he stated that he found

01:20:04    8    it on the sidewalk.

01:20:10    9    **Q**    And was the stool ever recovered?

01:20:13   10    **A**    No, it was not.

01:20:13   11    **Q**    You spoke as well of a, I think it was City Tap owner

01:20:24   12    that you spoke to --

01:20:26   13    **A**    Yes, sir.

01:20:26   14    **Q**    -- about some Crown Royal bottles that had been taken

01:20:32   15    from his place of business.

01:20:33   16          Did you question Mr. Buchanan about the Crown Royal

01:20:36   17    bottles?

01:20:37   18    **A**    We did not.  At the time, we didn't have the

01:20:39   19    information to do so.

01:20:41   20    **Q**    And when you spoke with the owner of City Tap, did he

01:20:48   21    have any information as to who was responsible for taking

01:20:51   22    those Crown Royal bottles?

01:20:53   23    **A**    No.  He and all his employees left out of concern for

01:20:59   24    their safety before things got to that point.

01:21:01   25    **Q**    And I think you indicated that when you -- well, you

| | | |
|---|---|---|
| 01:21:15 | 1 | weren't personally involved in Mr. Buchanan's arrest; is |
| 01:21:20 | 2 | that correct? |
| 01:21:20 | 3 | **A**    That's correct. |
| 01:21:22 | 4 | **Q**    Do you know when he was arrested in relation to this |
| 01:21:25 | 5 | incident? |
| 01:21:25 | 6 | **A**    Well, he was arrested on the 11th, late hours on the |
| 01:21:34 | 7 | 11th, around 8 p.m. give or take maybe, maybe 7 p.m., I |
| 01:21:39 | 8 | don't recall.  But it was I think 12 days from the 30th.  I |
| 01:21:43 | 9 | don't know if May has 30 or 31 days, but it was |
| 01:21:45 | 10 | approximately 12 days later. |
| 01:21:46 | 11 | **Q**    And do you know where he was arrested at? |
| 01:21:49 | 12 | **A**    He was arrested at his place of employment. |
| 01:21:53 | 13 | **Q**    And do you know where that's at? |
| 01:21:54 | 14 | **A**    I do. |
| 01:21:55 | 15 | **Q**    Could you tell us? |
| 01:21:56 | 16 | **A**    Sure.  It is Neo Parkway in Garfield Heights at a |
| 01:22:05 | 17 | Charter/Spectrum call center. |
| 01:22:07 | 18 | **Q**    And I believe you've described that from the time he |
| 01:22:11 | 19 | was arrested and ultimately interviewed by you, he was |
| 01:22:14 | 20 | otherwise compliant and cooperative? |
| 01:22:19 | 21 | **A**    He was. |
| 01:22:30 | 22 |           MR. BRADLEY:  I have no further questions, |
| 01:22:31 | 23 | Your Honor. |
| 01:22:33 | 24 |           THE COURT:  Mr. Zarzycki, do you have any |
| 01:22:35 | 25 | brief redirect?  You're not required to, but do you have |

**W. Hasty (Redirect by Zarzycki)**                    49

01:22:38    1    any?

01:22:45    2                    MR. ZARZYCKI:  Just one question.

01:22:49    3                        REDIRECT EXAMINATION

01:22:50    4    BY MR. ZARZYCKI:

01:22:50    5    **Q**    Agent Hasty, was there any evidence that you saw

01:22:56    6    during your interviews and any video that you saw that would

01:22:59    7    suggest that there was anyone inside the Colossal Cupcakes

01:23:04    8    before the person wearing all orange later identified as

01:23:10    9    Mr. Buchanan?

01:23:13   10    **A**    I don't believe so.

01:23:17   11                    MR. ZARZYCKI:  Okay.  Nothing further.

01:23:22   12                    THE COURT:  All right.  Agent Hasty, from my

01:23:24   13    understanding of what you've testified to, you are not, as

01:23:32   14    the Government's witness, asserting that this defendant was

01:23:34   15    responsible for firing a bullet through the window of the

01:23:42   16    cupcake store, are you?

01:23:43   17                    THE WITNESS:  Your Honor, I am only reporting

01:23:45   18    what the victim described.  I'm not purporting that that's

01:23:47   19    what Mr. Buchanan did.

01:23:50   20                    THE COURT:  Okay.  Likewise, you are not

01:23:53   21    asserting in your testimony or in your affidavit that this

01:23:59   22    defendant was responsible for throwing the cinder block that

01:24:01   23    you've described?

01:24:02   24                    THE WITNESS:  I'm not purporting that, Your

01:24:05   25    Honor.

01:24:05  1              THE COURT:  Okay.  The investigation obviously

01:24:07  2  continues, but as things stand today, you clarified for me

01:24:11  3  what your position is, correct?

01:24:13  4              THE WITNESS:  Yes, Your Honor.

01:24:14  5              THE COURT:  Is there anything further from the

01:24:17  6  United States in light of the Court's questions?

01:24:18  7              MR. ZARZYCKI:  No, Your Honor.

01:24:19  8              THE COURT:  Anything further from you,

01:24:21  9  Mr. Bradley, in light of the Court's questions or

01:24:24  10  Mr. Zarzycki's single redirect?

01:24:28  11              MR. BRADLEY:  No, Your Honor.

01:24:29  12              THE COURT:  All right.  Thank you.

01:24:29  13      Agent Hasty, we will deem you to have stepped down

01:24:34  14  even though you're not actually leaving a witness stand, but

01:24:36  15  your testimony has now concluded.

01:24:38  16      Does the Government have additional witnesses it

01:24:43  17  wishes to call?

01:24:44  18              MR. ZARZYCKI:  No, Your Honor.

01:24:45  19              THE COURT:  And do you have any additional

01:24:46  20  facts or evidence that you wish to submit?

01:24:51  21              MR. ZARZYCKI:  I do not.

01:24:52  22              THE COURT:  All right.  Thank you.

01:24:53  23      The Government's presentation is concluded.  We'll

01:24:56  24  move to the defense evidence, if any.

01:25:00  25      Mr. Bradley, you're entitled to submit evidence on

01:25:03  1   behalf of the defense.  Because this is not a presumption

01:25:05  2   case, there is no presumption that needed to be rebutted,

01:25:11  3   but do you have evidence you wish to submit on behalf of

01:25:15  4   Mr. Buchanan?

01:25:15  5              MR. BRADLEY:  Judge, we do not intend to call

01:25:17  6   any witnesses, and I believe that the Government has already

01:25:21  7   proffered the report of Pretrial Services, so I would simply

01:25:26  8   be relying on that information.  I have no additional

01:25:30  9   evidence or testimony to offer.

01:25:32  10             THE COURT:  Do you wish to proffer any facts

01:25:35  11  in support of your client's position?

01:25:39  12             MR. BRADLEY:  Not that is outside of the scope

01:25:44  13  of what's contained in the Pretrial Services report.

01:25:50  14             THE COURT:  All right.  So I understand what

01:25:51  15  you're saying.

01:25:52  16       On to brief arguments.  I think I understand the

01:25:55  17  Government's position, but, Mr. Zarzycki, if you could make

01:25:57  18  it clear on which basis the Government is seeking the

01:26:02  19  detention of this individual, I'd appreciate it.

01:26:09  20             MR. ZARZYCKI:  Yes, Your Honor.

01:26:10  21       The Government's primary argument for why we're

01:26:14  22  seeking detention is that I believe the evidence shows by

01:26:18  23  clear and convincing evidence that no condition or

01:26:21  24  combination of conditions will assure the safety of the

01:26:25  25  community.

01:26:27   1              THE COURT:  How do you wish to argue that

01:26:30   2    contention?

01:26:31   3              MR. ZARZYCKI:  I would argue that what the

01:26:34   4    evidence shows here is that we're basing this primarily on

01:26:42   5    the facts and circumstances of the incident itself and what

01:26:51   6    happened that day both during the offense involving Colossal

01:26:54   7    Cupcakes and surrounding all the things that there is

01:26:57   8    evidence to show that the defendant was responsible for on

01:27:01   9    May 30.

01:27:02  10         First, with respect to Colossal Cupcakes, when the

01:27:06  11    defendant was interviewed by the agent, he had stated

01:27:09  12    something to the effect that -- or as part of a potential

01:27:14  13    motive was the fact that the owner, he thought, was a donor

01:27:20  14    to a defense fund for Tamir Rice and that's part of the

01:27:24  15    reason why he did what he did.

01:27:26  16         And what he did here, Your Honor, was that in his

01:27:29  17    actions -- I believe the evidence does show that he was the

01:27:34  18    first one in that business.  Her phone, the very albeit

01:27:42  19    blurry still shot showed one person coming in before they go

01:27:45  20    running into the back of that store.  And that's the person

01:27:49  21    in orange, and that's how the defendant was dressed that

01:27:53  22    day.  And further evidence suggests that's him coming out

01:27:56  23    before other people have a chance to go in and take things

01:27:59  24    from her store.

01:28:01  25         He terrorized this victim, caused her to lock herself

01:28:07  1   and four employees into a bathroom for their own safety

01:28:11  2   while they had to sit there and listen to the store being

01:28:13  3   destroyed, not knowing whether they can come out or whether

01:28:16  4   it's safe to come out until they were rescued by the

01:28:19  5   Cleveland Police Department 10 minutes later.  They were

01:28:23  6   barricaded in the bathroom, partly on the actions of the

01:28:27  7   defendant.

01:28:27  8        And while they're in the bathroom, the defendant not

01:28:31  9   only comes into the store, he comes out of the store with a

01:28:34  10  chair that belongs to the store that he had no business

01:28:37  11  taking from the store and smashed her window, violently

01:28:42  12  smashed her window.  And this was all done in an environment

01:28:48  13  all surrounding the people from the street and the way the

01:28:53  14  agent described it, that individuals were breaking windows

01:28:57  15  and stealing things from stores up and down Euclid Avenue.

01:29:02  16  And the defendant was glad -- I shouldn't say "glad."  The

01:29:06  17  defendant was willingly a part of that activity.

01:29:09  18       But it wasn't -- with respect to detention, it wasn't

01:29:16  19  just the fact that he terrorized the victim and her

01:29:21  20  employees, causing them to barricade themselves in the

01:29:23  21  bathroom.  There were people in the store.  He didn't do

01:29:25  22  this at 2:00 in the morning.  This isn't just a property

01:29:27  23  crime.  There were people in there, employees, and the

01:29:31  24  defendant disregarded that when he came in and when he

01:29:34  25  destroyed that store.

01:29:37　1　　　　And in addition to that, he destroyed places all over

01:29:40　2　Cleveland, both before and after City -- before and after

01:29:47　3　Colossal Cupcakes.

01:29:48　4　　　　And the defendant can ask for a bond and say that he

01:29:53　5　can abide by the conditions of a bond, but when asked what

01:29:56　6　had happened, he tells the police exactly what he thinks

01:29:58　7　they want to hear.  Yes, he admitted that he was the person

01:30:01　8　in the video smashing the window.  It's clear that he's the

01:30:05　9　person smashing the window in the video, as Agent Hasty

01:30:09　10　said, when he compared his profile from his driver's

01:30:13　11　license.

01:30:13　12　　　　But when asked when he went home that night, he says

01:30:16　13　he went home at 7.  But there's evidence to suggest at 9:56

01:30:20　14　he's with his brother.  There's evidence to suggest that

01:30:23　15　he's with his brother's car at 9:30 at night.  There's

01:30:28　16　evidence to suggest that at that time things were looted,

01:30:30　17　including Crown Royal bottles from City Tap, and he's on his

01:30:36　18　text messages saying that he has Crown Royal bottles to

01:30:39　19　sell.

01:30:39　20　　　　So he lied to the police or to the agent.  He was

01:30:45　21　dishonest when he was telling them that he went home at 7:00

01:30:49　22　that night when the evidence suggests that he didn't.

01:30:51　23　　　　He also had a deer head trophy that was taken from

01:30:54　24　Geiger's which he told the agent he just picked up off the

01:30:59　25　ground and left it there.  But other video evidence shows

01:31:02  1    two blocks away in front of the Hanna Building carrying that

01:31:06  2    deer head down the street, per Agent Hasty's testimony.

01:31:10  3         There is further evidence that the minutes of his --

01:31:15  4    not just the fact that he was being dishonest but that he

01:31:20  5    was obstructing here.  And this is a person that wants the

01:31:23  6    Court to trust that he will abide by conditions of bond when

01:31:26  7    he -- when the investigation starts, his first instinct was

01:31:29  8    to make private his profile after seeing the news broadcast

01:31:34  9    of his picture put out to everyone in the public when they

01:31:41  10   get a tip that it's Mr. Buchanan, and within that same hour

01:31:44  11   his profile becomes private.

01:31:47  12        He admits that he threw away the evidence, the clothes

01:31:52  13   that he wore, the orange sweatshirt and the do-rag -- or the

01:31:56  14   head covering that he had.  So there is evidence not only

01:31:58  15   that he committed a violent act, that he terrorized five

01:32:02  16   different individuals, destroyed places all over Cleveland

01:32:07  17   between the times of 3:30 and 9:30 at night.  There's

01:32:10  18   evidence that he tried to obstruct and get rid of evidence

01:32:13  19   and that he was untruthful to the police.

01:32:16  20        All those things taken together show that -- or I

01:32:19  21   think are evidence that the defendant is a danger to the

01:32:23  22   public at this time, especially in light of the fact there

01:32:28  23   is some suggestion that he had a particular motive against

01:32:30  24   the victim owner of this particular store.  And as Agent

01:32:36  25   Hasty said, he was quite animated and emotional when he was

01:32:39  1   describing the fact that she -- or he thought that she

01:32:43  2   donated some money to some police defense fund.

01:32:46  3        So that is the Government's primary argument for

01:32:50  4   detention in this case.

01:32:51  5             THE COURT:  Thank you, Mr. Zarzycki.

01:32:54  6        Mr. Bradley, what's your argument?

01:32:56  7             MR. BRADLEY:  Judge, as you indicated at the

01:33:01  8   beginning of this hearing, there's a legal presumption that

01:33:06  9   Mr. Buchanan is entitled to a bond in this case, and I don't

01:33:11  10  believe that the Government has presented sufficient

01:33:15  11  evidence to overcome that presumption.

01:33:19  12       I would ask the Court to review all of the information

01:33:24  13  in the Pretrial Services report and ultimately adopt the

01:33:29  14  recommendation of Pretrial Services that he be released on a

01:33:34  15  $20,000 unsecured appearance bond with the various

01:33:38  16  conditions that are outlined in the report.

01:33:40  17       You can see from the report that my client's 22 years

01:33:46  18  old.  He is a lifelong resident of Northeast Ohio.  He has a

01:33:52  19  very stable family residence.  He's got absolutely no prior

01:33:57  20  criminal history whatsoever.  He's a high school graduate.

01:34:01  21  He's got two jobs.

01:34:05  22       I would note that Spectrum, where he was arrested,

01:34:14  23  would welcome him back so long as he can return back to work

01:34:18  24  within a reasonable time before he uses up his personal

01:34:25  25  days.

01:34:25  1      And I would also want to note that the Government made

01:34:29  2  the point that Mr. Buchanan terrorized the owner and

01:34:36  3  employees of Colossal Cupcakes, but there's no evidence that

01:34:39  4  he was responsible for that.  Somebody else apparently threw

01:34:44  5  some sort of brick in the direction of the store owner, but

01:34:47  6  there's no evidence that that was Mr. Buchanan.

01:34:50  7      And the employees and the owner that barricaded

01:34:55  8  themselves in the bathroom described hearing a number of

01:35:00  9  individuals, that it was very chaotic.  And so clearly there

01:35:05  10  were a number of individuals inside the store, no doubt

01:35:09  11  engaging in some sort of vandalism and destruction of inside

01:35:17  12  the store.  But again, there's no evidence that it was

01:35:19  13  Mr. Buchanan that was responsible for all of that.  So I

01:35:21  14  think it's unfair to make the characterization that he

01:35:27  15  somehow terrorized these individuals.

01:35:30  16      This, you know, frankly, was -- started off as a

01:35:35  17  peaceful protest that I'm sure you're well aware from the

01:35:39  18  news media that, you know, turned into -- it turned violent.

01:35:44  19  And Mr. Buchanan started off participating as a peaceful

01:35:48  20  protester.  And like a lot of individuals, it escalated into

01:35:54  21  violence.  And that was certainly wrong.

01:35:56  22      But that being said, there's really no evidence that's

01:36:01  23  been presented here other than that he engaged in damaging a

01:36:06  24  number of pieces of property belonging to these various

01:36:09  25  businesses.  But in the same token, there's no evidence been

01:36:13   1   presented that this was anything more than aberrant, that he

01:36:19   2   is -- there's no evidence that he's violent outside this --

01:36:24   3   other than what we have here from May 30, and there's no

01:36:27   4   evidence that he's a danger to the community.

01:36:30   5        And obviously, Pretrial Services has made a

01:36:34   6   recommendation that would be consistent with the notion that

01:36:37   7   he can appear as required at court and otherwise abide by

01:36:42   8   the rules of court while released on bond.  We would urge

01:36:46   9   the Court to adopt the recommendation in its entirety of

01:36:50   10  Pretrial Services.

01:36:52   11             THE COURT:  Mr. Zarzycki, the Government has

01:36:56   12  the burden of proof on its motion.  I'll give you the last

01:36:58   13  word if you have any additional words.

01:37:00   14             MR. ZARZYCKI:  I do, Your Honor, on one point.

01:37:06   15        I heard from defense's argument that there was no

01:37:08   16  evidence that he was response -- when talking about

01:37:13   17  terrorizing the owner and her four employees, there was no

01:37:16   18  evidence that he was responsible for that.

01:37:18   19        I didn't see that from the evidence.  I saw a lot of

01:37:21   20  evidence that he was responsible for that, that he was the

01:37:26   21  first one in through the broken window, before the other two

01:37:31   22  that you saw in the photos entered and went behind the

01:37:34   23  counter.  And that when he came out of that business, he

01:37:37   24  repeatedly smashed a metal chair into their window while

01:37:41   25  people were going in and out of that store.  At least one

01:37:46   1   you can see jumping through the window with some -- with a

01:37:50   2   drink or something that he had taken from that

01:37:52   3   establishment, all while the defendant was still smashing

01:37:55   4   that metal chair through that window.

01:37:57   5        Each exhibit shows each step and what's happening and

01:38:01   6   certainly some indication to show this Court how long he was

01:38:05   7   out there destroying that business.

01:38:08   8        So I believe there was evidence that he was

01:38:11   9   responsible certainly for causing these people to barricade

01:38:17   10  themselves into this bathroom for protection.

01:38:20   11            THE COURT:  Thank you, Mr. Zarzycki.

01:38:29   12       Thank you, Mr. Bradley.

01:38:30   13       Let me deal first with the issue of probable cause.

01:38:35   14       Based upon the record of evidence before the Court in

01:38:40   15  the complaint, complaint affidavit, and the testimony

01:38:42   16  presented here today, I do find that there's probable cause

01:38:45   17  to support the charge asserted in the complaint and probable

01:38:49   18  cause to believe that this individual was responsible for

01:38:54   19  that offense.

01:39:23   20       Based upon that finding, I am going to bind this

01:39:25   21  matter to the grand jury for further proceedings.

01:39:27   22       What that means, Mr. Buchanan, is the grand jury will

01:39:30   23  meet and consider this case as they see fit.  Should they

01:39:36   24  find that there's probable cause to support this charge or

01:39:38   25  other charge, they put down that charge on a document known

01:39:43   1   as an indictment and the case would proceed.  Should they

01:39:45   2   not find probable cause, then the case would be dismissed or

01:39:48   3   modified in some fashion.

01:39:50   4        Now let's turn to the issue of detention.

01:40:02   5        When the Government moves for detention, the Court has

01:40:04   6   certain requirements that the law requires me to follow.

01:40:13   7   Detention or bail determinations in the Federal Court are

01:40:16   8   required by the United States Bail Reform Act.

01:40:19   9        Now, the Bail Reform Act did away with the

01:40:21  10   old-fashioned, I guess you could say, way of looking at the

01:40:27  11   issue of bond.  It prohibits Federal Courts from holding

01:40:29  12   people in jail based on their ability to pay a bond, and it

01:40:33  13   sets forth instead a set of requirements that need to be

01:40:38  14   followed, so let me address those.

01:40:40  15        First, the Court is required to consider the nature

01:40:45  16   and circumstances of the offense that's alleged in the case.

01:40:48  17   So in this case, it's interference with commerce by means of

01:40:52  18   robbery, a violent offense as categorized under Federal law.

01:40:56  19   So I'm required to consider that this is -- this individual

01:41:00  20   is charged with an offense of violence under Federal law.

01:41:04  21        And I'm entitled to consider all of the facts that

01:41:09  22   have been proffered by the Government and/or submitted by

01:41:13  23   way of Government evidence.  But that's not all that the

01:41:16  24   Court's required to consider.  In fact, there are many other

01:41:19  25   things that I must consider.

01:41:22    1    And so I must also under the statute look at the

01:41:25    2    weight of the evidence against the person.  That's not the

01:41:27    3    weight of the evidence in the charged offense.  That's the

01:41:30    4    weight of the evidence to support the contention that the

01:41:34    5    defendant would pose a risk to society that could not be

01:41:40    6    managed through the imposition of bond conditions or the

01:41:47    7    weight of the evidence that the defendant would not return

01:41:49    8    to court when required to do so.

01:41:51    9    In this instance, the Government has not argued that

01:41:55    10   Mr. Buchanan poses a risk of flight or a risk of not

01:41:58    11   returning to the court.  Instead, the Government only argues

01:42:01    12   that bond conditions could not be put in place that would

01:42:05    13   safely manage him within the community.  So I've got to

01:42:09    14   consider the weight of the evidence.

01:42:10    15   I must also consider the characteristics of the

01:42:14    16   person, and that is the person, Mr. Buchanan, including the

01:42:19    17   following:  The person's character, his physical and mental

01:42:24    18   condition, his family ties, his employment, his financial

01:42:29    19   resources, his length of residence in the community, his

01:42:33    20   community ties, his past conduct, his criminal history, if

01:42:38    21   any, his history of substance abuse or alcohol abuse, if

01:42:43    22   any, and the record he may have had concerning court

01:42:48    23   appearances in the past.

01:42:49    24   Further, the Court must consider whether at the time

01:42:51    25   of the current offense the individual was on any kind of

01:42:55  1    court supervision and/or pretrial release.

01:42:59  2         So looking at those factors, obviously -- I say

01:43:04  3    "obviously."  The Pretrial Services report indicates, and

01:43:06  4    neither attorney had said anything different, that

01:43:12  5    Mr. Buchanan has no criminal history at all, not even any

01:43:16  6    more minor reported traffic offenses.

01:43:19  7         Now, we would not pick up tickets, speeding tickets

01:43:22  8    and things like that, but this report would pick up offenses

01:43:36  9    like driving under the influence, driving under suspension,

01:43:38  10   things of that sort.  There's no reports of anything like

01:43:41  11   that.  So there's no history of failing to appear in court.

01:43:54  12        Further, there is no significant history of substance

01:43:58  13   abuse in Mr. Buchanan's Pretrial Services report.  It

01:44:01  14   indicates that he smoked marijuana in the past but stopped

01:44:04  15   when he got his current job.

01:44:06  16        Mr. Boardman, are you able to hear me?  I'm getting

01:44:09  17   notification from my computer that my audio is not working.

01:45:14  18                  [Off-the-record discussion.]

01:45:14  19             THE COURT:  Well, folks, I apologize.  I have

01:45:15  20   no idea what's going on with my computer, because I'm

01:45:17  21   getting a message saying that my microphone is not working,

01:45:21  22   please use a different speaker.  But you seem to be able to

01:45:25  23   hear me, so I will press on.

01:45:26  24        All right.  I was indicating that Mr. Buchanan

01:45:33  25   presents with no history of substance abuse other than

01:45:36 1     former marijuana smoking which he seems to have voluntarily

01:45:40 2     given up in order to be able to maintain his current

01:45:45 3     employment with Spectrum.

01:45:50 4         Now, Mr. Buchanan has lifetime connections to the

01:45:54 5     community, family ties to the community. He's employed; he

01:45:57 6     appears to be working two jobs.

01:46:00 7         In short, the history and characteristics of the

01:46:02 8     person all would suggest that this individual does not come

01:46:10 9     to court with some track record of malfeasance over his

01:46:15 10     years of life such that we could not manage him if he were

01:46:21 11     released in the community on bond.

01:46:27 12         Moreover, as has been pointed out by the defense but

01:46:30 13     carefully not mentioned by the Government, the report of our

01:46:32 14     Pretrial Services officer contains a recommendation that

01:46:35 15     Mr. Buchanan be granted bond.

01:46:40 16         And not only that, the report contains the results of

01:46:43 17     the pretrial risk assessment that Officer Stolarik

01:46:49 18     performed. And in categorizing the risk presented by this

01:46:56 19     individual, he is categorized as a category 2 potential

01:47:01 20     risk.

01:47:01 21         Now, in that risk assessment individuals are placed in

01:47:04 22     a category from 1 to 5 with 1 being the least

01:47:10 23     risk-presenting individual and 5 being the greatest risk.

01:47:14 24     Those in category 2 are almost always granted bond unless

01:47:18 25     there's something truly unusual about the case that would

01:47:22  1  suggest that bond conditions could not be put in place that

01:47:26  2  would allow us to successfully manage the individual in the

01:47:29  3  community.

01:47:29  4       Now, taking all of these factors into consideration

01:47:33  5  and taking into consideration the Government's presentation

01:47:36  6  of evidence concerning an incident and set of incidents on

01:47:41  7  May 30 in Cleveland, Ohio, that everybody in the community

01:47:46  8  is concerned about and which defense counsel himself

01:47:50  9  acknowledges were wrong behavior, I do conclude that the

01:47:54  10  Government has not met its burden to show by clear and

01:47:57  11  convincing evidence that bond conditions can't be

01:48:02  12  established for Mr. Buchanan that would allow him to be on

01:48:05  13  pretrial release until this case can be brought forward into

01:48:09  14  the court and a determination be made at that point in time

01:48:13  15  whether he's guilty or not guilty of the charge or charges

01:48:17  16  to be asserted against him.

01:48:19  17       So at this time, the Court will grant Mr. Buchanan

01:48:22  18  bond and will overrule the Government's motion for

01:48:27  19  detention.

01:48:27  20       Now, having said that, let me address Mr. Buchanan on

01:48:36  21  the conditions of bond.

01:48:37  22       Mr. Buchanan, you're going to be released on what is

01:48:43  23  known as a $20,000 unsecured bond.  Now, that means that you

01:48:49  24  do not have to immediately post cash in order to be released

01:48:54  25  from custody, but it also means that if you fail to comply

01:48:56  1   with the conditions of bond set by the Court or you violate

01:49:02  2   the conditions of release, you could be required to forfeit

01:49:04  3   up to $20,000 for that violation of bond.

01:49:10  4        Do you understand that?

01:49:11  5                  THE DEFENDANT:  Yes, Your Honor.

01:49:12  6                  THE COURT:  Now, in terms of the conditions of

01:49:19  7   release, there will be both standard and specialized

01:49:24  8   conditions.

01:49:26  9        The standard conditions of release are as follows:

01:49:30  10  During the time on release, you must not violate any

01:49:34  11  Federal, state, or local laws.  Any further violations of

01:49:38  12  the law could result in you being taken back into custody

01:49:47  13  until the time this case is tried and finished.

01:49:50  14       Do you understand that, Mr. Buchanan?

01:49:52  15                 THE DEFENDANT:  Yes, Your Honor.

01:49:53  16                 THE COURT:  You must cooperate with the

01:49:57  17  collection of a DNA sample if that is requested by your

01:50:01  18  pretrial officer and if it is authorized by law.

01:50:05  19       You must provide your pretrial service officer with

01:50:10  20  the address where you'll be staying and a good working

01:50:13  21  telephone number.  And you may not change either your

01:50:15  22  address or your telephone number unless you do so in writing

01:50:18  23  to your pretrial officer in advance.

01:50:21  24       Do you understand that, Mr. Buchanan?

01:50:23  25                 THE DEFENDANT:  Yes, Your Honor.

01:50:25  1          THE COURT:  Now, obviously, you must appear in

01:50:29  2     court when required, and you must surrender, if convicted,

01:50:34  3     to serve any sentence that may be imposed by the Court.

01:50:39  4     Those are the standard conditions of release.

01:50:42  5          In addition, you will be supervised by the Cleveland

01:50:47  6     office of the U.S. Pretrial Services and Probation

01:50:51  7     Department, and you must report to that office as soon as

01:50:54  8     possible after you're released.  I'll talk to you more in a

01:50:57  9     moment about the mechanics of doing that.

01:51:00  10         If you have a passport, you must surrender it.  If you

01:51:03  11    do not have a passport, you must not obtain a passport or

01:51:07  12    any other international travel documents.

01:51:10  13         Your travel is going to be restricted to the Northern

01:51:16  14    District of Ohio, which is essentially the northern half of

01:51:18  15    this state.  If you're not certain about where the actual

01:51:22  16    boundary is, please make sure you check with your pretrial

01:51:25  17    officer or your lawyer, and do not travel outside the

01:51:30  18    district unless you have permission in advance to do so.

01:51:33  19         Now, as you've probably been able to surmise, the

01:51:38  20    investigation of this case is ongoing, and the Court has

01:51:42  21    been presented today with various video and photographic --

01:51:45  22    not video but photographic evidence taken from videos which

01:51:49  23    depict different people.  And as you've heard, the

01:51:55  24    Government contends that there were other people involved in

01:51:57  25    the offense that you are alleged to have been involved with.

01:52:00  1      During your time of pretrial release, you may not have

01:52:04  2  any direct or indirect contact with anyone who is thought to

01:52:07  3  be a witness or a potential codefendant in this situation.

01:52:11  4  So to the extent you've seen photographs and you may

01:52:15  5  recognize people, you may not have any direct or indirect

01:52:19  6  contact with those folks.

01:52:20  7      Direct contact means you cannot go where they are and

01:52:23  8  speak to them.  You cannot text message them or Facebook

01:52:26  9  message them or Instagram direct message them.  No direct

01:52:31  10  contact with those individuals is permitted at all.  And

01:52:35  11  indirect contact means you can't have someone else do for

01:52:38  12  you what the Court is prohibiting you to do for yourself.

01:52:43  13  And it's important to notify you that attempting to

01:52:48  14  interfere with other witnesses is itself a separate offense.

01:52:52  15      So, Mr. Buchanan, do you understand what I mean when I

01:52:55  16  say you may not have any direct or indirect contact with

01:52:58  17  other people who are witnesses or potential codefendants?

01:53:03  18                  THE DEFENDANT:  Yes, Your Honor.

01:53:04  19                  THE COURT:  In the same way, you may not have

01:53:07  20  any contact, directly or indirectly, with anyone who is said

01:53:11  21  to have been a victim of this offense.  You may not go to

01:53:15  22  the location of the alleged offense.  You may not attempt to

01:53:19  23  interact with anyone who works there or attempt to do

01:53:21  24  business there or attempt to size up the location for

01:53:25  25  yourself.

01:53:26  1    Do you understand what I'm saying about that,

01:53:29  2  Mr. Buchanan?

01:53:30  3              THE DEFENDANT:  Yes, Your Honor.

01:53:30  4              THE COURT:  During this time of your release

01:53:35  5  you will be required to undergo a mental health evaluation

01:53:40  6  if directed by Pretrial Services, so if you are requested to

01:53:44  7  do that, you must cooperate with such evaluation.

01:53:47  8    During this time of your release you may not possess

01:53:51  9  any destructive device, firearm, or other weapon.  You may

01:53:55  10  not use or unlawfully possess any narcotic drugs unless you

01:53:59  11  have a prescription from a medical health provider for such

01:54:04  12  medications.

01:54:05  13    You are subject to regular random drug testing during

01:54:09  14  this time of your release, and you could be required to

01:54:11  15  participate in some kind of substance abuse treatment if

01:54:16  16  that is found to be necessary by your Pretrial Services

01:54:20  17  officer.

01:54:20  18    Now, there is an indication that one of the potential

01:54:25  19  residences where you could stay has -- that someone who

01:54:31  20  stays there may have a firearm.  You would not be permitted

01:54:33  21  to stay there if there is a firearm in the residence.

01:54:36  22      Do you understand that, Mr. Buchanan?

          23              THE DEFENDANT:  Yes.

01:54:46  24              THE COURT:  Do you understand that?

01:54:51  25    Mr. Buchanan, let me ask again:  Do you understand

01:54:54   1   you're not permitted to stay at any residence where someone

01:54:56   2   may have a firearm?

01:54:57   3                   THE DEFENDANT:  Yes, Your Honor.

01:54:57   4                   THE COURT:  And if someone there does have a

01:55:01   5   firearm, they would be required to place that firearm in the

01:55:08   6   hands of a third party and have the appropriate receipt form

01:55:14   7   which your counsel would be able to assist you with or your

01:55:16   8   pretrial officer would be able to assist you with.

01:55:28   9       Now, in addition to the specific conditions

01:55:30   10   recommended by your pretrial officer, the Court is going to

01:55:33   11   require that you participate in a location restriction

01:55:37   12   program, and you're going to be required to participate in

01:55:41   13   the curfew portion of location restriction.  And there may

01:55:46   14   be location monitoring technology required of you at the

01:55:50   15   discretion of your pretrial officer.

01:55:53   16       You will be allowed to leave the residence to go to

01:55:56   17   work and maintain contact with your attorney and other

01:55:59   18   things of that nature, but you will be given a curfew

01:56:02   19   schedule and you'll be required to comply with that.  And

01:56:06   20   you must cooperate with the use of some kind of location

01:56:10   21   monitoring technology.

01:56:12   22       I am going to order that you be maintained in custody

01:56:15   23   until arrangements can be made for location monitoring to be

01:56:20   24   set up and a determination can be made that the residence

01:56:24   25   where you would be staying would be suitable.  I'm quite

01:56:30  1   sure that one of them will be, but those things have to be

01:56:32  2   taken care of before you're actually able to be released.

01:56:35  3   That might take another day or two.

01:56:38  4        All right, Mr. Buchanan, those are the conditions of

01:56:40  5   your release.  Do you have any questions about anything I've

01:56:42  6   said to you with regard to those conditions?

01:56:47  7                THE DEFENDANT:  No questions.  Thank you, Your

01:56:49  8   Honor.

01:56:49  9                THE COURT:  Okay.  Now, let me talk to you

01:56:52  10  briefly about how we're going to get these bond documents

01:56:54  11  executed.

01:56:55  12       If you were in the courtroom right now, at the

01:56:57  13  conclusion of the hearing I would provide a set of the bond

01:56:59  14  documents to you and your lawyer for you to review with him.

01:57:02  15  After reviewing them, you would then be required to sign

01:57:04  16  those documents, and you'd get a copy of them so you'd know

01:57:09  17  exactly what it is that's being required of you.

01:57:11  18       Because we are appearing through videoconference and

01:57:16  19  are not together in the courtroom, the way we've been

01:57:18  20  handling it is to submit those bond documents to counsel

01:57:22  21  with a request that counsel be given permission by you to

01:57:26  22  sign them.

01:57:27  23       So the question I have for you, Mr. Buchanan, is do

01:57:30  24  you authorize Attorney Bradley to review the bond documents

01:57:33  25  on your behalf and to sign them for you with the

01:57:37  1   understanding that he would get a copy of the document to

01:57:42  2   you at the proper time?

01:57:44  3              THE DEFENDANT:  Yes, Your Honor.

01:57:44  4              THE COURT:  All right.  So, Mr. Bradley, you

01:57:47  5   will be authorized to receive, review, and sign the bond

01:57:51  6   documents.  You can then return a signed copy back to our

01:57:56  7   court, and we'll see that this process moves forward

01:58:00  8   properly.

01:58:02  9              MR. BRADLEY:  Very good.

01:58:04  10             THE COURT:  All right.  I think I've disposed

01:58:06  11  of all the issues before the Court that need to be addressed

01:58:08  12  today.  Let me ask whether there's anything further from

01:58:12  13  counsel for the United States.

01:58:13  14             MR. ZARZYCKI:  No, Your Honor.  Thank you.

01:58:16  15             THE COURT:  All right.  Mr. Bradley, do you

01:58:18  16  have any further issues for the defense?

01:58:19  17             MR. BRADLEY:  No, Your Honor.  Thank you very

01:58:21  18  much.

01:58:21  19             THE COURT:  Pretrial Officer Stolarik had to

01:58:26  20  exit to attend another hearing.  Officer Travis Jennings has

01:58:29  21  been in the hearing since she had to go.

01:58:31  22      Officer Jennings, is there anything that you need

01:58:34  23  clarified on behalf of Pretrial?

01:58:36  24             PRETRIAL SERVICES OFFICER JENNINGS:  Just a

01:58:38  25  simple, defendant is currently held until the electronic

01:58:41  1  monitoring is set up; is that correct?

01:58:42  2              THE COURT:  That is correct.

01:58:44  3              PRETRIAL SERVICES OFFICER:  Other than that,

01:58:45  4  Your Honor, no.

01:58:46  5              THE COURT:  All right.  Thank you everyone.

01:58:48  6  That will conclude these proceedings.

01:58:52  7              (Proceedings adjourned at 1:58 p.m.)

8                      *  *  *  *  *

9                  **C E R T I F I C A T E**

10

11      I certify that the foregoing is a correct transcript

12  of the record of proceedings in the above-entitled matter

13  prepared from my stenotype notes.

14

15          */s/ Lance A. Boardman_____  06-22-2020*
           Lance A. Boardman, RDR, CRR              DATE
16

17

18

19

20

21

22

23

24

25